ORVILLE S. BURNETT

*v.*

THE PEOPLE OF THE STATE OF ILLINOIS.

*Opinion filed October 26, 1903.*

1. CRIMINAL LAW—*when act of principal is the act of an accessory.* An act of the principal, if done pursuant to the will of an accessory, is the act of the accessory, and the latter may be indicted and punished as a principal.

2. SAME—*status of survivor of attempted double suicide.* The survivor of an attempted double suicide cannot be convicted of murder, in absence of evidence that he actually killed deceased, or that he did or said something which aided or encouraged her to kill herself.

3. SAME—*inducing another to commit suicide is murder.* Proof that the accused induced another person to commit suicide by taking poison is sufficient to warrant his conviction for murder, but in such case strict proof that the poison was taken by his procurement is required.

4. SAME—*when jury should be cautioned in considering admissions of accused.* The jury should be instructed to receive with caution verbal admissions drawn from the accused by questions at a time when his mental condition was doubtful.

5. SAME—*confession offered in evidence must be considered as a whole.* Those portions of a confession introduced in evidence which are in favor of the accused are entitled to as much consideration by the jury as those which are against him, where they are not disproved by other testimony and are not improbable or untrue when considered with all the other evidence.

6. EVIDENCE—*when admitting proof of chastity is prejudicial.* Admitting proof of general good reputation of deceased for chastity

is prejudicial to one on trial for inducing her to commit suicide, where such chastity is not an issue in the case, and was not attacked except as the evidence disclosed that she and accused were occupying the same room at a hotel when the suicide occurred.

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. FRANK BAKER, Judge, presiding.

Plaintiff in error sues out this writ of error to the criminal court of Cook county to review a judgment and sentence pronounced against him in that court for the murder of Charlotte S. Nichol.

The indictment contained two counts. The first count charges the plaintiff in error with having produced the death of the deceased by administering poison to her. The second count charges the plaintiff in error with murder, charging, first, an unlawful and felonious assault upon the said Charlotte S. Nichol, and then charging that with malice aforethought, and feloniously and willfully devising and intending the said Charlotte S. Nichol to then and there poison, kill and murder herself, did then and there counsel, hire, persuade and procure the said Charlotte S. Nichol to then and there take into her mouth a large quantity of morphine,—a deadly poison,— with intent that she should take and swallow the same for the purpose of then and there poisoning, killing and murdering herself, and that in consideration of such counseling, hiring, persuading and procuring, the said Charlotte S. Nichol did take and swallow the said morphine, from which she died. The count concludes that the plaintiff in error "the said Charlotte S. Nichol, in manner and form aforesaid, then and there unlawfully, willfully, feloniously and of his malice aforethought did kill and murder, contrary to the statute and against the peace and dignity of the said People of the State of Illinois."

The jury returned a verdict of murder and fixed defendant's punishment at fifteen years in the penitentiary, upon which judgment and sentence were had. The de-

fendant has sued out this writ of error, and assigns as error that the evidence did not establish the defendant's guilt; that the court erred in allowing the State to introduce evidence of the deceased's reputation for chastity, and erred in refusing to give the defendant's third, fourth and fifth refused instructions, which dealt with the weight to be given to the confessions or admissions testified to as having been made by the defendant.

O'DONNELL & BRADY, and WILLIAM DILLON, for plaintiff in error.

H. J. HAMLIN, Attorney General, and CHARLES S. DENEEN, State's Attorney, (J. R. NEWCOMER, and F. L. BARNETT, of counsel,) for the People.

Mr. JUSTICE RICKS delivered the opinion of the court:

The evidence discloses that the plaintiff in error, Orville S. Burnett, whom we will refer to hereafter as defendant, a married man about twenty-eight years of age, living with his wife, was a practicing dentist, with an office in the city of Chicago; that he had resided there some two or three years, and that his family relation was pleasant. The deceased, Charlotte S. Nichol, was a married woman living with her husband and three children, residing about three blocks distant from defendant's residence and place of business. About the third of September, 1901, defendant became acquainted with the deceased, Mrs. Nichol, in a drug-store under his office. At that time Mrs. Nichol was with a woman called Kirby Smith, from some place in Tennessee. The defendant and the two women casually met in this store, and, without anybody to introduce them, formed an acquaintance. Between that time and the 20th of October,—the date of the death of Mrs. Nichol and of the alleged crime of the defendant,—the defendant and Mrs. Nichol were very frequently together,—sometimes accompanied by Kirby Smith, on which occasions they went to theaters, saloons,

luncheons and dinners, and at other times visiting the house of Mrs. Nichol, accompanied by a man named Adams, and one time, at least, upon the invitation of the husband of Mrs. Nichol, visited the home of the latter and took dinner there. The evidence shows that on the night of Wednesday, the 17th of October, the defendant and Mrs. Nichol spent the night together at the Marlborough Hotel. The husband of Mrs. Nichol was holding some official position with a railroad company and had formerly lived in Tennessee. Shortly prior to Mrs. Nichol's death her husband had been promoted to a higher position with the railroad company, which necessitated his return to Nashville to reside. This change of residence was very distasteful to Mrs. Nichol, as it appeared that her home life in Tennessee, where she had formerly resided with relatives of her husband, had been made unpleasant, and also for the further reason that during her brief acquaintance with defendant she had formed a violent attachment for him and was very loath to leave him. When Mrs. Nichol was apprised that it was necessary for her to change her residence it seems that the idea of suicide at once entered her mind, and on the Wednesday evening preceding her death, being the same day she learned of the proposed change, she sought the defendant, went to saloons with him, drank with him, spent the night at the Marlborough, as above stated, and during that night constantly talked about committing suicide, stating that she had sufficient chloral to accomplish that end. The defendant advised her against pursuing this course, pointing out to her the absurdity of doing so. The following Saturday evening,—the night of her death,—defendant again met her about six o'clock, and from that time until one or two o'clock the following morning, in the company of each other, they were in a number of saloons, each drinking quite heavily and each taking whisky. During the evening Mrs. Nichol was continually talking about committing suicide, stating

that she would not go back to Nashville under any circumstances, and informed the defendant that she had determined to commit suicide, stating she had in her pocket-book two phials of morphine, and solicited the defendant a number of times to commit suicide with her, which he refused to do. About two o'clock on Saturday morning they arrived at the Marlborough Hotel, where they secured a room together for the night. When they arrived there, defendant, Burnett, was quite drunk, but Mrs. Nichol did not seem to be drunk but in the possession of her senses. A short time after entering the room Burnett went across the street to a drug-store and purchased a phial of morphine containing twenty-five quarter-grain tablets, which he brought to the room, opened and set upon the dresser, and at which time he states there were two similar phials standing upon the same dresser. When he returned the deceased was undressed, being simply in a night-robe, and lying on the bed and seemingly very happy. She requested some paper and an envelope, which defendant rang for and which were brought. The sheet of paper and envelope were delivered to Mrs. Nichol as she lay in bed, in the presence of the maid who brought them. Mrs. Nichol at once began writing upon the paper handed to her. When defendant opened the phial of morphine purchased by himself, it overturned, and a portion of its contents,—about half,— spilled on the floor. Defendant then undressed and retired, and went to sleep without taking any of the morphine. Some time the next day, when he awoke, he found that Mrs. Nichol was lying by his side dead, and found a note written by her upon the dresser and over or against the empty morphine bottles, which was as follows:

"*To whom it may concern*—I did it because I loved him better than anything on earth, and he loved me, and we could not be separated. Good-by.                    CHARLOTTE."

Upon discovering the death of Mrs. Nichol, defendant, horror stricken at the situation in which he found

himself and believing that his life was ruined, arose, took the morphine remaining in the bottle purchased by himself, attempted to cut his throat or puncture his neck with a hat-pin, and turned on the gas and lay down. The proprietress of the house, detecting the gas, came to the door and was admitted by defendant. A doctor and the police were called at once. Restoratives were given to defendant, and about three hours later he was taken to the police station, where a statement was taken from him.

The statements of the defendant, Burnett, are substantially the only evidence in the case in any manner connecting him with the death of Mrs. Nichol. These statements began when the doctor arrived, and were concluded (there being several of them) about ten o'clock at night, in the police station. The portions of the statements or admissions chiefly relied on for conviction were to the effect that he had agreed with the deceased to commit suicide if she did. No witness heard any of the conversation between the parties. No witness saw anything done by either of them calculated to produce the death of the deceased, and outside of the statements of Dr. Burnett, the defendant, the only evidence was the fact of their being together in the place, the note found and the three empty morphine phials, and the testimony of the druggist that a man somewhat resembling the defendant purchased a phial of morphine during that night.

The first person to see the defendant, outside of the chambermaid and the landlady, who had no conversation with him and knew nothing about him outside of the fact that he was drunk when he came in the night before and that the paper was called for and given to the deceased, was Dr. Carter, a witness for the People, who arrived there at 3:30 P. M., and testifies that when he first saw defendant he was in a sort of dazed or stupefied condition, with the pupil slightly contracted, but that at that time the witness could not tell whether the defendant was suffering from the effect of the excessive use of

liquor or the effect of morphine. To the doctor, upon his inquiry, the defendant stated that he and the woman had taken a room together there, and that sooner than go south with her family she had taken the suicide route, and called the doctor's attention to the note which one of the maids of the hotel had found. When asked as to the cause of death the defendant pointed to the dresser, where three empty morphine phials were, and stated that she had taken a quantity of morphine; that the defendant awoke some time during the afternoon and also attempted to commit suicide, calling attention to the scratch on his neck made by the hat-pin, and stated that he had taken morphine and turned on the gas, and requested the witness to give him more morphine that he might finish his undertaking. To the doctor he said nothing about any agreement between him and the deceased to commit suicide. The doctor stated that at the first visit he staid but a short time and returned in an hour, and found the pupil contracted and the patient in a semi-comatose condition. He stated that the effect of morphine was first promotive of mind exhilaration, and secondarily resulting in stupor, and finally in death, unless checked. He stated also that he administered an emetic to the patient and tortured him to keep him awake, and directed the officer to use his club on the bottom of the defendant's feet, as that was the best treatment to keep one from relapsing into sleep in case of morphine poison; that the primary effect of morphine lasted about four hours and the after-effect several hours, the exact time not stated; that he saw the defendant at six o'clock the last time, and that defendant was then tending towards stupor; that when he first talked to the defendant he was apparently rational, but any stimulant would give that impression at first; that the stimulus to the mind is the first effect, but in an hour, when witness became satisfied that defendant's condition was due to morphine, he regarded him as not responsible for what he was saying.

Officer O'Brien seems to have been the next person in the order of those to see defendant. He stated that he arrived at the Marlborough about four o'clock, and that defendant was still lying in bed, opposite the body of Mrs. Nichol, and was not yet dressed, and that he stayed until six o'clock and assisted in taking him to the station; that defendant pointed out to him, while there, the drug store where he got the morphine, and that defendant also said that he and deceased agreed to commit suicide together before they came to the hotel that evening. This witness also testified that the defendant told him he tried to kill himself with his knife. The officer took the knife and it was introduced in evidence. To this officer nothing was said about the hat-pin. Describing the condition of the defendant and how he talked with him, the officer said that he was directed by the doctor to keep the defendant awake; that he put water on him, rubbed a big piece of ice steadily up and down his back for half an hour, pinched and slapped him, shook him, pulled his ears and did everything he could to keep him awake, and that the statements made by the defendant were in answer to questions put by him.

Officer White, who assisted O'Brien in taking the defendant to the station, testified that he arrived at the Marlborough about five o'clock, and that officer O'Brien was trying to put the defendant's clothes on him when he arrived; that the defendant could not get up,—could not handle himself; that they had to dress him, and that the defendant made no statement while he was there; that they all tried to keep him awake, and that it took a full hour to dress him.

When the defendant was taken to the police station, officer Shaughnessy, connected with that station, was directed to take defendant's statement, which he says he did, in writing. The written statement was not offered in evidence. Sidney M. Weil, a newspaper reporter, was present at the taking of that statement, and both were

witnesses at the trial. While assisting with that state-
ment, the defendant said that the deceased stated that
she could not live in Nashville and could not bear to
leave the defendant, and that she was going to commit
suicide, and asked him to commit suicide with her; that
at first he did not like the idea, but finally assented; that
she told him that she had enough morphine for herself
but not enough for two, and that he went out and got a
bottle of morphine and came in and set it on the dresser.
In this statement the defendant detailed the trip of the
deceased and himself the night of and preceding the
tragedy, and as much as he knew relative to it. The tes-
timony of the witness Weil in regard to it covers some
four or five pages, and the witness states that they were
a full hour getting the statement; that the defendant
was lying in bed when he and the officer went in to see
him, and apparently asleep; that they aroused him and
told him that they desired to take his statement; that it
was necessary to shake him and wake him up or arouse
him, and that they did shake him several times during
this conversation; that both Shaughnessy and the wit-
ness would shake him and then ask him more questions,
and that after getting the thread of the story the de-
fendant would doze off, his eyes would close, he would
breathe heavily and the lids of his eyes would flutter;
that it would take a second or two to arouse him at each
time; that he was under a heavy drug of some kind; that
the defendant volunteered nothing himself; that it was
all solicited from him by questions, and he only made
statements as questions were asked him, except in one
or two instances. As to the condition of the defendant
at that time both Weil and Shaughnessy agree, Shaugh-
nessy stating that the defendant had to be aroused every
fifteen or twenty seconds and seemed to be dazed and
stupefied.

The next witness who testified was Charles F. Car-
penter, who took a statement from the defendant about

ten o'clock at night, when he was in his cell.   This witness testifies that defendant was not asked by him the direct question whether he did agree with deceased to commit suicide, but he (witness) told him that the officers of the station were so reporting, and he asked him what about it, when the defendant said: "I suppose I said it; I was drunk; I suppose I agreed; I suppose it was true." As to the condition of the defendant at that time this witness says: "When I began talking to him he did not talk very freely; he seemed to be in a kind of stupor; he was all humped up in a chair and did not seem to pay any attention to surroundings; I put the questions to him and he would answer yes or no; did not go ahead and tell the story; he would affirm or deny a story; he never contradicted me in any of them; he seemed to assent to whatever I said; no difference what I said, he seemed to agree with me; I would make suggestions and he would assent; that is practically it."

There is no evidence, either by the admissions of the defendant or any witness, that the deceased took any morphine in the presence of the defendant, or that he gave her any, or requested her to take any, or bought any for her.   The evidence rather tends to show that while the defendant was gone to the drug-store to get the morphine that he purchased, the deceased took that which she had.   In one of the alleged confessions or admissions the defendant said, "I drank considerable, and she had worked me up to such a state that I agreed to do anything with her."   The defendant testified in his own behalf and denied explicitly that he ever stated to Mrs. Nichol that he would kill himself if she did, but, on the contrary, he urged and counseled her against suicide; that the deceased insisted that she would commit suicide and had sufficient morphine in her pocket-book to accomplish that end, and further stated that she would never return to Nashville. Defendant denied that he saw her take any morphine or advised her to take any, and

stated that he had no recollection whatever of being at the police station or making any statements or confessions or admissions that were offered in evidence against him, but did admit that he bought the morphine, but was unable to state why he did it.   He swore that he took none of it until after he had discovered that Mrs. Nichol was dead, and then not in pursuance of an agreement, but because of his disgrace and humiliation.

The conviction of the defendant for murder in this case can only be sustained on the hypothesis that there was an agreement between him and Mrs. Nichol to commit suicide together, and that that agreement, in part, at least, was the inducing cause of the deceased taking the poison that produced her death.   Upon the question whether, under the circumstances, suicide is a crime, we have a paucity of decisions.   The general rule as stated by Wharton is: "If two persons encourage each other to commit suicide jointly, and one succeeds and the other fails in the attempt upon himself, he is a principal in the murder of the other." (Wharton on Crim. Law, sec. 448.) There are a number of English cases that hold if two persons mutually agree to commit suicide and the means employed produce death upon one of the persons only, that the one surviving will be guilty of murder; but in all such cases the defendant was actually present and did some act furthering the commission of the suicide. Thus, in *Regina* v. *Jessop*, 10 Crim. Law Mag. 862, Jessop handed the bottle of laudanum to the deceased with the intention that the deceased should drink therefrom a sufficient quantity to cause death.   In *Regina* v. *Stormouth*, Q. B. Div. 61 J. P. 729, there was an agreement to commit suicide between a man and a woman because of poverty. The agreement was mutual, and each purchased laudanum to carry out the agreement.   The woman took the laudanum and died.   The man took a portion but did not die, and left a note in the room where they both had been, stating that they had made such an agreement, and that

the laudanum taken by the woman had produced death but his had not proved fatal, so that other means must be resorted to. On the same day of the discovery of the death of the woman the man was arrested. In discussing the case the court said: "If there was an agreement, in consequence of which the woman destroyed herself, the prisoner was guilty, in the law, of murder; and the fact that that might have been only a pretended agreement on his part, or that he might have had some idea of not carrying out his part of the agreement, or have changed his mind, made no difference in law."

In this State we have never had the question before us, and there are few cases decided by other courts of this country. In *Blackburn* v. *Ohio*, 23 Ohio St. 146, Blackburn and a woman named Lovell mutually agreed to commit suicide. The defendant mixed strychnine with wine, and in pursuance of the agreement the woman drank the mixture. There was some evidence tending to show that the defendant, by threats, forced the woman to take the poison. The defendant was found guilty and appealed, contending that as suicide was not punishable there could be no conviction as an accessory. To this contention the court said: "Purposely and maliciously to kill a human being by administering to him or her poison is declared by the law to be murder, irrespective of the wishes or the condition of the party to whom the poison is administered, or the manner in which or the means by which it is administered. The fact that the guilty party intends also to take his own life, and that the administration of the poison is in pursuance of an agreement that both will commit suicide, does not, in a legal sense, vary the case. If the prisoner furnished the poison to the deceased for the purpose and with the intent that she should with it commit suicide, and she accordingly took and used it for that purpose, or if he did not furnish the poison but was present at the taking thereof by the deceased, participating, by persuasion, force, threats or otherwise, in the

taking thereof or the introduction of it into her stomach or body, then, in either of the cases supposed, he administered the poison to her, within the meaning of the statute. Her act of taking and swallowing it in his presence and by his direction was his act of administering it. It is said by counsel that suicide is no crime by the laws of Ohio, and that therefore there can be no accessories or principals in the second degree in suicide. This is true; but the real criminal act charged here is not suicide, but the administering of poison, and to this criminal act there may be accessories and principals in the second degree. If I furnish poison to a guilty agent,—an accomplice,— to be administered by him, and he administers it accordingly, I am accessory before the fact; and if I stand by and counsel or encourage him in the act of administering the poison to another I am a principal in the second degree. But no question of this kind arises in the present case, either upon the indictment or in the evidence. There is no claim or pretense that there was any guilty third person participating in the transaction. The charge is, that the prisoner, as principal in the first degree, is guilty of administering poison and thereby causing death. We think, therefore, that the court did not err in its instructions as to what amounted to the administering of poison within the meaning of the Crimes act."

In *Commonwealth* v. *Bowen*, 13 Mass. 356, one Jewett was imprisoned under sentence of death, and the defendant, Bowen, having an opportunity to talk with him, advised him to commit suicide, and procured and brought to him for that purpose a rope, with which Jewett did hang himself. The defendant was indicted for murder, there being two counts. The first count charged that the defendant "did counsel, hire, persuade and procure said Jewett" to kill himself. The second count charged, directly, that Bowen murdered Jewett by hanging. This seems to be the first and leading reported case in any of the States upon this question. Upon appeal the court

said: "You have heard it said, gentlemen, that, admitting the facts alleged in the indictment, still they do not amount to murder, for Jewett himself was the immediate cause and perpetrator of the act which terminated in his own destruction. That the act of Bowen was innocent no one will pretend; but is his offense embraced by the technical definition of a principal in murder? Self-destruction is doubtless a crime of awful turpitude. It is considered in the eye of the law of equal heinousness with the murder of one by another. In this offense, it is true, the actual murderer escaped punishment, for the very commission of the crime, which the law would otherwise punish with the utmost vigor, puts the offender beyond the reach of its infliction, and in this he is distinguished from other murderers. But his punishment is as severe as the nature of the case will admit. His body is buried in infamy, and in England his property is forfeited to the king. Now, if the murder of one's self is felony, the accessory is equally guilty as if he had aided and abetted in the murder of A by B, and I apprehend that if a man murders himself, and one stands by aiding in and abetting the death, he is as guilty as if he had conducted himself in the same manner where A murders B; and if one becomes the procuring cause of death, though absent, he is accessory."

The only other reported case that we know of is that of *Commonwealth* v. *Mink*, 123 Mass. 429. In that case the defendant was engaged to be married to one Charles Ricker, who expressed his intention of breaking the engagement. This announcement so exasperated the defendant that she determined to take her own life, and, seizing a revolver, made an attempt to shoot herself. Ricker being present, seized her and attempted to prevent her carrying out her purpose, and in the struggle the pistol was accidentally discharged, fatally wounding Ricker. The defendant was indicted and convicted of manslaughter. The court held that suicide was a

criminal act, and followed the principle that if one attempts to commit a criminal act and thereby commits homicide, although no homicide was intended, the crime will be manslaughter. It was also held that in that State suicide was not technically a felony, and the conviction was sustained.

We are not disposed to go to the extent of holding, as was done in the *Bowen case, supra,* that suicide or self-destruction is a felony, but take the view that the later pronouncement of the Massachusetts court in the *Mink case, supra,* and of the Ohio court in the *Blackburn case, supra,* more nearly announce the correct rule. By the English common law suicide was a felony, and the punishment for him who committed it was interment in the highway with a stake driven through the body, and the forfeiture of his lands, goods and chattels to the king. We adopted the English common law, and the acts of the British parliament in aid thereof, as it existed up to the fourth year of James I, which was the year 1606, as far as the same was applicable to our conditions and institutions and of a general nature; but as we have never had a forfeiture of goods or seen fit to define what character of burial our citizens shall enjoy, we have never regarded the English law as to suicide as applicable to the spirit of our institutions. In the view we entertain of the case at bar it is not necessary that suicide be held to be a crime. The charge against the plaintiff in error in both counts in the indictment is murder. In the first count he is charged with murdering Charlotte S. Nichol by administering poison to her, and in the second count with murdering her by hiring, persuading and procuring her to take poison, and we think proof of either one of these charges would warrant the conviction for murder.

The English common law, as applied to accessories before and at the fact, has become more a form than a substance under our law. From an early day we held that under our statute the accessory before and at the

fact could be indicted as a principal; (*Baxter* v. *People*, 3 Gilm. 368;) and in two cases where the question was directly presented, we held that it was improper to indict an accessory simply as such, as was done at common law, but that he must be indicted as principal. (*Usselton* v. *People*, 149 Ill. 612; *Fixmer* v. *People*, 153 id. 123.) As to the crime of murder, we have applied the rule that he who acts by another acts by himself, and that the acts of the principal are the acts of the accessory, and that the latter may be charged with having done the acts himself, and may be indicted and punished accordingly. (*Spies* v. *People*, 122 Ill. 1.) If a lunatic or an idiot, at the instigation or direction of another person, should commit a homicide, none would question but that the instigator and director in such case would be guilty of murder, although the principal could not be punished at all; and if A, by virtue of deceit or persuasion, induce B to kill himself, this is as much the act of A as though A had induced C to kill B. The charge in the second count of the indictment is, that plaintiff in error did "hire, persuade and procure" the deceased to kill herself, and if he did either of these, and as a result thereof deceased did kill herself, it was the act of plaintiff in error, and we have no hesitancy in pronouncing it murder if the element of malice is found.

Counsel for plaintiff in error have ably and elaborately discussed the proposition that the second count is merely a charge against the plaintiff in error as an accessory, and that in order that there shall be an accessory there must be a principal, and as under our law suicide is not a crime, the act of the deceased in killing herself was not a criminal act and there was no crime committed. But when we apply the principle above announced, that the act of the principal, when done pursuant to the will and direction of the accessory, is the act of the accessory, then it becomes immaterial what was the character of the crime committed by the principal or whether there

was any crime, and in such case as this, where it is not shown or claimed that the accused directly administered the poison of which the deceased died, but that the taking of it was by his procurement, we should require strict proof of this latter fact. Though the plaintiff in error may have known that the deceased intended to kill herself, and may have assented to it, or may have even wished that she would do so, still, unless the evidence shows, beyond a reasonable doubt, that he did or said something which aided, encouraged or induced deceased to kill herself, he cannot be held guilty of the charge of murder. (*White* v. *People,* 81 Ill. 333; *Jones* v. *People,* 166 id. 264.) The evidence that plaintiff in error did do or say anything that might by any possibility have been an inducement to the deceased to kill herself rested wholly upon his alleged admissions. Those admissions were made under such circumstances and when the plaintiff in error was in such condition, physically and mentally, as should have required the court to have made proper investigation before they were admitted at all, and if admitted, to have fairly instructed the jury as to the character of and weight to be given to admissions and confessions made under the conditions here shown. This was especially so in view of the instructions of the court as to the substance of the crime. By the thirteenth instruction the jury were told that suicide was self-murder, and while this instruction is not complained of, and probably, as modified by what follows it, would not be reversible error even if objection had been made to it, the effect of it was to declare that felonious which is not a felony under our law. The jury were also told that the plaintiff in error was permitted to testify in his own behalf, and stated the true test as to his credibility, and attached to that instruction the charge that if the accused had willfully and corruptly testified falsely to any fact material to the issue, the jury could entirely disregard his evidence, except in so far as it was corroborated.

There was no possible contradiction of the evidence of the plaintiff in error upon the material things testified to, except that growing out of his alleged admissions. There was not a single witness put upon the stand by the State to prove a substantial fact in the case outside of the *corpus delicti*, and, in fact, the whole case for both sides practically rested upon the testimony of the plaintiff in error and on his alleged statements to the police authorities. Plaintiff in error offered three instructions, which were refused by the court, which related to the alleged admissions. The first told the jury that confessions of a person, out of court, at best are a doubtful species of evidence, and should be acted upon by the jury with great caution, unless supported by other corroborative evidence. The fourth and fifth instructions were as follows:

4. "The court instructs the jury that where a confession of the prisoner charged with a crime is offered in evidence, the whole of the confession so offered and testified to must be taken together, as well that part which makes in favor of the accused as that part which makes against him; and if the part of the statement which is in favor of the defendant is not disproved by other testimony in the case, and is not improbable or untrue, considered in connection with all the other testimony of the case, then that part of the statement is entitled to as much consideration from the jury as the parts which make against the defendant.

5. "The court instructs the jury that if they believe, from the evidence in this case, that the defendant, at the time he made the confession which has been given in evidence, was in a dazed and stupefied condition from the joint effect of intoxicating drink, morphine and the inhaling of illuminating gas, or from the effects of any one or any two of these agencies, and if the jury further believe, from the evidence, that the confession was elicited from the defendant by questions while he was in

204—15

such condition, then such confession is entitled to very little weight, and the jury would not be justified in convicting the defendant upon said confession unless they find it is corroborated by other testimony in the case."

No instruction was given with reference to the weight or character of the testimony, such as is referred to in the instructions and was the main reliance for conviction. The fifth instruction is defective, and we could not say that it was reversible error to refuse it, for that reason. But no objection can be raised as to the fourth, and as all the alleged admissions of the plaintiff in error that were offered in evidence were mere verbal admissions, none of them rising to the dignity of a confession, between which and admissions there is a well recognized distinction in the law, and as the admissions were drawn from the plaintiff in error by questions when in a condition that his mental status was doubtful, the jury should have been told by some instruction that they should be received with caution. (*Marzen* v. *People*, 173 Ill. 43; *Ackerson* v. *People*, 124 id. 563; *Jones* v. *State*, 29 Tex. App. 20; *Conner* v. *State*, 34 Tex. 659; *Commonwealth* v. *Howe*, 9 Gray, 110.) We think the refusal to give the fourth instruction was manifest error.

Some fifteen witnesses were, over the objection of plaintiff in error, allowed to testify as to the general reputation of the deceased, in the community in which she lived, for chastity. That question was not an issue in the case. (5 Am. & Eng. Ency. of Law,—2d ed.— p. 872; *Cannon* v. *People*, 141 Ill. 270; 3 Greenleaf on Evidence,—15th ed.—par. 27.) Her chastity had not been attacked, except in so far as the nature of it appeared from her relation with plaintiff in error and the opening remarks of counsel for plaintiff in error. This evidence covered the life of the deceased for several years back, both in Illinois and Tennessee. There was nothing in the record justifying any such evidence as this. The witnesses all declared her general reputation for chastity

to be good. The plaintiff in error stood charged with her murder as the result of a liaison between them, and none can doubt but that the testimony thus admitted was calculated to, and did, prejudice the jury against the plaintiff in error. By it the natural inference arising in the minds of the jury was, that the deceased was a good and virtuous woman who had been despoiled by the plaintiff in error, and because of an affection produced by his effort they had mutually agreed to commit suicide sooner than separate. The only evidence as to their relation came from the admissions and testimony of plaintiff in error, and upon these matters it was wholly uncontradicted; and not only that, but every part of it, as made to the various witnesses, was harmonious with every other part, and all tended to show that the deceased sought plaintiff in error; telephoned him at his office; would go to his office in the guise of a patient; would go to the drugstore under his place of business and send for him, and in a general way seek him out that she might be in his company. This was uncontradicted; yet the jury might feel warranted, from the evidence, in finding that the deceased was a woman of good character and chaste life when considering the precautionary instruction as to the weight that was to be given to the testimony of plaintiff in error, and their right to wholly disregard it if they believed he willfully swore falsely upon any material matter, and in concluding that her general reputation should weigh more in their estimation than his testimony as to the circumstances which brought and kept them together, and the probable influence plaintiff in error had in producing her death.

The judgment is reversed and the cause remanded to the criminal court of Cook county for further proceedings in harmony with this opinion.

*Reversed and remanded.*