PEOPLE v. ROBERTS.

1. CONSTITUTIONAL LAW—MURDER—CONFESSION—DETERMINING DE-
   GREE—STATUTES.

   In a prosecution for murder, where defendant pleaded guilty,
   under 3 Comp. Laws 1915, § 15194, the trial court properly
   proceeded, by examination of witnesses, to determine the
   degree of the crime, and defendant was deprived of no
   constitutional right by the court's refusal to call a jury,
   since, had a jury determined its degree, they would have
   done so under the instruction of the court.

2. HOMICIDE—POISONING—STATUTES.

   Where defendant mixed paris green with water and placed
   it within reach of his wife to enable her to put an end
   to her suffering by putting an end to her life, which she
   did, he was guilty of murder by means of poison within
   the meaning of the statute (3 Comp. Laws 1915, § 15192),
   even though she requested him to do so.

   Authorities passing on the question of inciting or abetting
   suicide are collated in notes in 66 L. R. A. 304; 22 L. R. A.
   (N. S.) 243.

3. INDICTMENT AND INFORMATION—HOMICIDE—UNNECESSARY TO SET
   OUT MEANS USED.
   Under 3 Comp. Laws 1915, § 15739, it was not necessary to
      set out in the information the means by which the death
      of deceased was accomplished.

Error to Isabella; Hart (Ray), J.  Submitted April
16, 1920.  (Docket No. 110.)  Decided July 20, 1920.

Frank C. Roberts was convicted of murder in the
first degree, and sentenced to imprisonment for life
in the State prison at Marquette.  Affirmed.

*James H. Pound,* for appellant.

*Alex. J. Groesbeck,* Attorney General, and *Virgil
W. McClintic,* Prosecuting Attorney, for the people.

BIRD, J.  Defendant was adjudged guilty of murder
in the first degree in the Isabella circuit court on his
plea of confession and on the testimony which was
taken by the court.  Several errors are now assigned
on the proceedings in behalf of defendant.  Some of
the errors assigned render it necessary to set out the
proceedings at some length.  Following the death of
defendant's wife he was arrested on a charge of mur-
dering her.  A complaint was made in due form, on
June 14, 1919, a warrant issued thereon, and defend-
ant was apprehended and brought before the justice,
on June 25th, where he waived a preliminary exami-
nation.  Subsequently, on July 12th, he was taken be-
fore the circuit court in pursuance of his own request
and arraigned.  After the information was read to
him he was interrogated by the court as to whether
he understood the charge and whether he understood
it to be murder.  He replied that he did.  He indicated
that he would like to have counsel, whereupon the
court appointed Mr. Dusenberry, an experienced at-
torney, at his request.  Later in the day the defend-

ant and his counsel came into court and the following took place:

"*The Court:* You have had an attorney appointed. Are you present with that attorney, and are you ready to plead now?

"*Mr. Roberts:* Yes, sir.

"*The Court:* Do you wish to plead to the information?

"*Mr. Roberts:* Yes, sir.

"*The Court:* What is your plea?

"*Mr. Roberts:* Guilty.

"*The Court:* Guilty as charged?

"*Mr. Roberts:* Yes, sir.

"*Mr. Dusenberry:* I am going to ask your honor. His father is here and I wish you would talk to him, and then you can talk to respondent in private." ·

Dr. Michael Bronstetter was then called by the people and testified as follows:

"I am coroner of Isabella county. I presided at the inquest upon the body of Katie Roberts, who I knew in her life. The body over which I held the inquest was her body. I knew her as the wife of Frank Roberts. I was the surgeon who opened up the body, and I examined her stomach, and other intestinal organs.

"*Q.* In what condition was the stomach, as you found it?

"*A.* The stomach was greatly dilated with gas, and partly with fluid, in the amount of eight oz. Otherwise it was in a good state of preservation.

"*Q.* Did there seem to be any other substance in it when you took it out of the body?

"*A.* There was a greenish substance in the stomach and some in the esophagus.

"*Q.* What did you do with the stomach?

"*A.* I tied it at both ends, before removing it, so as not to spill the contents, placed it in a glass container, and personally took it, with the other organs, to the State board of health at Lansing.

"*Q.* Have you had any return from the analysis of that stomach, as made there?

"*A.* I have.

"*Q.* What did that show?

"*A.* The stomach showed on analysis at Lansing 84-100 of an ounce of paris green. * * *

"*Q.* At the time you held the *post mortem* did you examine the other organs in the body? That is, the heart and lungs and things of that sort?

"*A.* I did.

"*Q.* Did you find any trace of any organic trouble, inside there, other than in the stomach?

"*A.* I did not.

"*Q.* From the condition of the body, as you found it, and the amount of paris green so found in the stomach, what would you say as to what was the cause of death?

"*A.* Acritic arsenical poison.

"Examined by the court.

"*Q.* Doctor, did you identify the body as that of Katie Roberts, wife of Frank Roberts?

"*A.* I did.

"*Q.* You identified it as being the wife of defendant here?

"*A.* Yes, sir.

"*Q.* Doctor, did you talk with the defendant about this matter?

"*A.* No, I have not. This is the first time I have seen him, since her death.

"*Q.* Did you ever treat him?

"*A.* I treated Mr. Roberts' wife. I sent her to Ann Arbor.

"Examined by Mr. Dusenberry.

"*Q.* You had reference to a time you had sent Mrs. Roberts as a patient?

"*A.* Yes, sir.

"*Q.* When was that, Doctor?

"*A.* I could not say just when. * * * About three or four months before her death. * * * I saw her at her home where they lived. She was a bed patient, or practically so at that time. She was in bed, and I believe she said she was unable to do any kind of work. Whether she could get up, and around or not, I don't know. Her body was considerably wasted. She showed evidence of a long drawn out sickness. She showed symptoms of a multiple sclerosis.

"*Q.* What is that?

"*A.* It is a disease of the central nervous system, affecting both the brain and cord. The causes of these patches in the brain and cord is unknown. This condition I found with this patient. She had the outward signs of multiple sclerosis, the rapid pulse, hesitating, singsong speech. And from these signs you diagnose the multiple sclerosis.

"*Q.* Was she practically helpless?

"*A.* I should say practically. Just how specifically, I could not say.

"*Q.* Basing your answer upon your observation, at that time, did you consider her a hopeless patient, or did you consider she might possibly recover?

"*A.* I considered her case as incurable.

"*Q.* Did you advise that she go to the hospital?

"*A.* I don't know whether I did or not, or whether that was suggested by some one else. That might have been suggested by some one outside. But I consented to send her.

"*Q.* Did you send her to the hospital?

"*A.* I believe I made the motion that she be sent at the county's expense. It at least had my sanction.

(Coroner's findings, marked Exhibit A.)

"*Mr. McClintic:* I offer Exhibit A in evidence.

"*Mr. Dusenberry:* I want to have the record show, in justice to my client. He says that he paid the expenses to the hospital himself. And that it wasn't at the county's expense.

"*The Court:* I think I said I would accept his plea, I think I will accept his plea anyway."

Defendant Roberts then took the stand and was interrogated by counsel, as follows:

"Examined by Mr. Dusenberry:

"*Q.* Your wife was sent to the hospital at Ann Arbor?

"*A.* I took her myself. * * * She was there thirty days, I think. I did not stay there at Ann Arbor while she was there. I took her myself, and made three trips down to see her while she was there, and I brought her back myself. I paid the expenses incident to her going to the hospital, and staying there the thirty days. It wasn't paid by the county. I paid it out of my own pocket.

"Examined by Mr. McClintic:

"*Q.* On May 23d, 1919, Mr. Roberts, I understand, you told me that you had mixed a quantity of paris green in a cup?

"*A.* Yes, sir.

"*Q.* At your wife's request, and placed that on a chair near her side?

"*A.* Yes, sir.

"*Q.* Is that right?

"*A.* Yes, sir.

"*Q.* You did that?

"*A.* Yes, sir.

"*Q.* And that she had requested you to do that, so she could drink it. Is that right?

"*A.* Yes, sir.

"*Q.* And that subsequently she did take that?

"*A.* Yes, sir.

"*Q.* And a few hours after that she died. Is that right?

"*A.* Yes, sir.

"Examined by Mr. Dusenberry:

"*Q.* Had she ever tried to commit suicide before?

"*A.* Yes, sir.

"*Q.* When was that?

"*A.* Last summer.

"*Q.* What means did she try to use?

"*A.* Carbolic acid.

"*Q.* So that by her previous actions you knew that she was desirous of dying?

"*A.* Yes, sir."

The court, after having a private conference with defendant, proceeded to sentence him in the following language:

"After hearing your plea of guilty, as charged in the information in this case to killing, and murdering your wife, Mr. Roberts, and after hearing the testimony and evidence introduced in court bearing upon the degree of the crime charged, the court hereby determines that you have committed murder in the first degree, and judgment will be rendered accordingly, by the order of the court. Under the finding of the court there is only one sentence that can be pronounced upon you, and that is the severer one, of

course. The statute provides that where murder shall be perpetrated by means of poison, that shall be murder in the first degree, and the punishment shall be confinement in the State's prison.

"It is beyond my comprehension how a human being of normal conditions at least, or apparent normal conditions, can commit such a crime, as you have in this case, by placing poison within reach of your wife or giving it to your wife with the intention as you claim. It doesn't make any difference whether she had that intention or not, of committing suicide. You are a principal, under the law of the State to committing the crime of murder. It was, indeed, an inhuman and dastardly act. The sentence of the court is that you be confined to the State's prison, located at Marquette, for the period of your natural life, at hard labor, and in solitary confinement, in accordance and with section 15192 of the Compiled Laws of 1915."

1. It is urged that the trial court was in error in not impaneling a jury to determine the degree of murder, that such right could not be waived by the defendant and that the statute directing the court to determine the degree in such event is unconstitutional. In determining the degree of murder the trial court followed the direction of the statute which provides that:

"The jury before whom any person indicted for murder shall be tried, shall, if they find such person guilty thereof, ascertain in their verdict, whether it be murder of the first or second degree; but, if such person shall be convicted by confession, the court shall proceed by examination of witnesses to determine the degree of the crime, and shall render judgment accordingly." 3 Comp. Laws 1915, § 15194.

Counsel argues that defendant's constitutional right to have the jury determine his guilt was invaded when the court determined its degree. Defendant undoubtedly had the right to have a jury determine his guilt but his guilt had already been confessed. His plea of confession had made a trial unnecessary. There was

211—Mich.—13.

nothing else to do but apply the statute and classify his crime. The fact that the court did this instead of the jury deprived defendant of no substantial right because had a jury determined its degree they would have done so under the instruction of the court. The constitutionality of such statutes has been directly passed upon by the Federal court. *Hallinger* v. *Davis*, 146 U. S. 314 (13 Sup. Ct. Rep. 105). In this case the New Jersey statute, which is similar to ours, was under consideration. Its constitutionality had been attacked for the same reasons that counsel has urged. It was there said in conclusion that

"Applying the principles of these decisions to the case before us, we are readily brought to the conclusion that the appellant, in voluntarily availing himself of the provision of the statute and electing to plead guilty, was deprived of no right or privilege within the protection of the 14th Amendment. The trial seems to have been conducted in strict accordance with the forms prescribed by the Constitution and laws of the State, and with special regard to the rights of the accused thereunder. The court refrained from at once accepting his plea of guilty, assigned him counsel, and twice adjourned, for a period of several days, in order that he might be fully advised of the truth, force and effect of his plea of guilty. Whatever may be thought of the wisdom of departing, in capital cases, from time-honored procedure, there is certainly nothing in the present record to enable this court to perceive that the rights of the appellant, so far as the laws and the Constitution of the United States are concerned, have been in any wise infringed."

The State of California has a similar statutory provision. Its validity was passed upon in *People* v. *Noll*, 20 Cal. 164, which is approved in the case cited. It is there said in part:

"The proceeding to determine the degree of the crime of murder, after a plea of guilty, is not a trial. No issue was joined upon which there could be a trial. There is no provision of the constitution which pre-

vents a defendant from pleading guilty to the indictment instead of having a trial by jury. If he elects to plead guilty to the indictment the provision of the statute for determining the degree of the guilt for the purpose of fixing the punishment, does not deprive him of any right of trial by jury."

The State of Ohio also has a similar provision, which was upheld in *Dailey* v. *State,* 4 Ohio St. 57.

Counsel's objection based upon this part of the proceeding must be overruled.

2. The proceedings are further assailed by the claim that there is no evidence of the commission of the crime charged. In support of this counsel contends, in substance, that suicide is not a crime in Michigan. That defendant's wife committed no offense in committing suicide, that if she, as principal, committed no offense, defendant committed none as an accessory before the fact. In short, that if the principal is not guilty the accessory is not. If we were living in a purely common-law atmosphere with a strictly common-law practice, and defendant were charged with being guilty as an accessory of the offense of suicide, counsel's argument would be more persuasive than it is. But defendant is not charged with that offense. He is charged with murder and the theory of the people was that he committed the crime by means of poison. He has come into court and confessed that he mixed poison with water and placed it within her reach, but at her request. The important question, therefore, arises as to whether what defendant did constitutes murder by means of poison.

"All murder which shall be perpetrated by means of poison, or lying in wait, or any other kind of wilful, deliberate, and premeditated killing, or shall be committed in the perpetration or attempt to perpetrate in arson, rape, robbery or burglary, shall be deemed murder of the first degree, and shall be punished by solitary confinement at hard labor in the State's prison for life." 3 Comp. Laws 1915, § 15192.

In considering the status of one who advises or aids another to commit suicide, 37 Cyc. p. 521, has this to say:

"Where one person advises, aids, or abets another to commit suicide, and the other by reason thereof kills himself, and the adviser is present when he does so, he is guilty of murder as a principal, or in some jurisdictions of manslaughter; or if two persons mutually agree to kill themselves together, and the means employed to produce death take effect upon one only, the survivor is guilty of murder of the one who dies. But if the one who encourages another to commit suicide is not present when the act is done, he is an accessory before the act and at common law escapes punishment because his principal cannot be first tried and convicted. The abolition of the distinction between aiders and accessories in some jurisdictions, has, however, carried away this distinction, so that a person may now be convicted of murder for advising a suicide, whether absent or present at the time it is committed, provided the suicide is the result of his advice."

It is said in Tiffany on Criminal Law, p. 979, that:

"He who kills another at his own desire or command is a murderer as much as if he had done it of his own head; and the person killed is not a *felo de se*."

To the same effect, 1 McLain's Criminal Law, § 290; *State* v. *Ludwig*, 70 Mo. 412; *Commonwealth* v. *Bowen*, 13 Mass. 356; *Commonwealth* v. *Mink*, 123 Mass. 422; *Commonwealth* v. *Hicks*, 118 Ky. 637 (82 S. W. 265); *Burnett* v. *People*, 204 Ill. 208 (68 N. E. 505, 66 L. R. A. 304); *Blackburn* v. *State*, 23 Ohio St. 146

In the last case cited the facts and questions raised bear a close analogy to the case we are considering. A like contention was made with reference to suicide, and in answering it the court said:

"It is said by counsel that suicide is no crime by the laws of Ohio, and that therefore there can be no accessories or principals in the second degree in sui-

cide. This is true, but the real criminal *act* charged here is not *suicide*, but the *administering of poison*. And to this criminal act there may be accessories, and principals in the second degree. If I furnish poison to a *guilty* agent, an accomplice, to be administered by him, and he administers it accordingly, I am an accessory before the fact; and if I stand by and counsel or encourage him in the act of administering the poison to another, I am a principal in the second degree. But no question of this kind arises in the present case, either upon the indictment or in the evidence. There is no claim or pretense that there was any *guilty third person* participating in the transaction. The charge is that the prisoner, as principal in the first degree, is guilty of *administering poison*, and thereby causing death."

Whether the act of mixing the strychnine with wine and giving it to the deceased to drink was administering poison within the meaning of the statute, the opinion says:

"We think also that the court was right in instructing the jury, as in substance and effect it did, that it is immaterial whether the party taking the poison took it willingly, intending thereby to commit suicide, or was overcome by force, or overreached by fraud. True, the atrocity of the crime, in a moral sense, would be greatly diminished by the fact that suicide was intended; yet the law, as we understand it, makes no discrimination on that account. The lives of all are equally under the protection of the law, and under that protection to their last moment. The life of those to whom life has become a burden—of those who are hopelessly diseased or fatally wounded—nay, even the lives of criminals condemned to death, are under the protection of the law, equally as the lives of those who are in the full tide of life's enjoyment, and anxious to continue to live. If discriminations are to be made in such cases as to the amount of punishment due to offenders, they must be made by the exercise of executive clemency or legislative provision. Purposely and maliciously to kill a human being, by administering to him or her poison, is declared by the law to be

murder, irrespective of the wishes or the condition of the party to whom the poison is administered, or the manner in which, or the means by which, it is administered. The fact that the guilty party intends also to take his own life, and that the administration of the poison is in pursuance of an agreement that both will commit suicide, does not, in a legal sense, vary the case. If the prisoner furnished the poison to the deceased for the purpose and with the intent that she should with it commit suicide, and she accordingly took and used it for that purpose; or, if he did not furnish the poison, but was present at the taking thereof by the deceased, participating by persuasion, force, threats, or otherwise, in the taking thereof, or the introduction of it into her stomach or body; then, in either of the cases supposed, he administered the poison to her, within the meaning of the statute."

We are of the opinion that when defendant mixed the paris green with water and placed it within reach of his wife to enable her to put an end to her suffering by putting an end to her life, he was guilty of murder by means of poison within the meaning of the statute, even though she requested him to do so. By this act he deliberately placed within her reach the means of taking her own life, which she could have obtained in no other way by reason of her helpless condition.

3. Exception is taken to the information because it did not set out the means by which defendant accomplished the murder. This objection is sufficiently answered by the statute, which provides that:

"In all indictments for murder and manslaughter, it shall not be necessary to set forth the manner in which, or the means by which the death of the deceased was caused; but it shall be sufficient in any indictment for murder to charge that the defendant did wilfully, and, of his malice aforethought, kill and murder the deceased." 3 Comp. Laws 1915, § 15739.

There are some other questions discussed by counsel which we shall not consider because the basis for

so doing does not appear in the record. So far as the record discloses defendant was dealt with fairly by the public authorities and his legal rights duly observed.

The judgment of conviction must be affirmed.

MOORE, C. J., and STEERE, BROOKE, FELLOWS, and STONE, JJ., concurred. CLARK and SHARPE, JJ., did not sit.