Jack KEVORKIAN and Janet
Good, Plaintiffs,

v.

Richard THOMPSON, Prosecuting Attorney for the County of Oakland,
Michigan, Defendant.

No. 96–CV–73777–DT.

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 6, 1997.

---

Geoffrey N. Fieger, Southfield, MI, for plaintiffs.

Mary Massaron Ross, Detroit, MI, for defendant.

*AMENDED OPINION AND ORDER REGARDING THE PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT*[1]

ROSEN, District Judge.

## I. INTRODUCTION

In this declaratory judgment/injunctive relief action, Plaintiffs Jack Kevorkian and Janet Good seek a court order enjoining Defendant Richard Thompson and his successor in the office of Oakland County Prosecutor from prosecuting Kevorkian for his assisted suicide activities. At the heart of both Plaintiffs' Amended Complaint for Declaratory and Injunctive Relief and their motion for summary judgment is their contention that the statutes and the common law under which Kevorkian has been prosecuted in the past are unconstitutional, and therefore, any future prosecutions of Dr. Kevorkian will result in the deprivation of their constitutional rights.

---

1. This matter originally came before the Court on Plaintiffs' Motion for Preliminary Injunction. However, at the September 26, 1996 hearing, counsel for the parties stipulated to the conversion of Plaintiffs' Motion for Preliminary Injunction to a motion for summary judgment.

Defendant also asked for a summary judgment dismissal decision in his Opposition Brief, and Defendant's counsel orally cross-moved for summary judgment in favor of Defendant at the September 26 hearing.

Plaintiffs' Amended Complaint contains four counts, all asking the Court for declaratory and injunctive relief. In Count I, Plaintiffs ask the Court to find that M.C.L. § 750.505 (the Michigan "common law savings statute"), and the Michigan Supreme Court's December 13, 1994 ruling that Plaintiff Kevorkian may be prosecuted for assisting in a suicide under this statute, is unconstitutionally vague, overbroad, and violates the prohibition against *ex post facto* laws. In Count II, Plaintiffs ask the Court to declare that mentally competent terminally ill or intractably suffering adults have a liberty interest protected by the Fourteenth Amendment's Due Process Clause to end their suffering by committing suicide and to seek physician aid in doing so. In Count III, Plaintiffs seek a declaration that any unwritten common law which affords patients attached to life support systems the right to terminate life support but denies a mentally competent, terminally ill or intractably suffering adult not on life support the right to commit suicide with the assistance of a physician violates the Equal Protection Clause of the Fourteenth Amendment. In Count IV, Plaintiffs allege that should another criminal charge be filed against Dr. Kevorkian and/or Janet Good under M.C.L. § 750.505, they will be deprived of their Fifth and Fourteenth Amendment liberty interests, and the right to be free of unreasonable seizure under the Fourth and Fourteenth Amendments. Therefore, they ask the Court to enjoin Richard Thompson from engaging in any action to enforce M.C.L. § 750.505 as it pertains the Plaintiffs' assistance in any suicide.

## II. *PROCEDURAL BACKGROUND/STATE COURT DECISIONS*

In 1992, the Oakland County Circuit Court (Breck, J.) entered an order granting Jack Kevorkian's motion to dismiss two counts of open murder for assisting in the suicides of Marjorie Wantz and Sherry Miller in October of 1991 on the ground that physician-assisted suicide is not a crime in Michigan. The Oakland County Prosecutor appealed

that decision to the Michigan Court of Appeals and the appellate court reversed the circuit court's decision. *People v. Kevorkian,* 205 Mich.App. 180, 517 N.W.2d 293 (1994).

While the appeal of the Oakland County Circuit Court's 1992 order was pending, on December 15, 1992, the Michigan Legislature enacted a statute, M.C.L. § 752.1021, *et seq.,* which took effect on February 25, 1993. That statute established a commission to study voluntary termination of life and created a new crime of "criminal assistance of suicide."[2] Two judges of the Wayne County Circuit Court, in two separate cases, subsequently declared that the criminal provisions of the new statute were unconstitutional. Judge Cynthia Stephens entered a declaratory judgment declaring the new statute unconstitutional in a declaratory judgment action filed by a terminally ill individual, Teresa Hobbins, and seven health care professionals. Judge Stephens also held that individuals have a constitutional right to commit suicide. Judge Richard Kaufman held that "in some instances", a person has a constitutional right to commit suicide. Finding that one of Kevorkian's "patients", Donald O'Keefe, had a constitutional right to commit suicide, Judge Kaufman dismissed the assisted suicide charge against Dr. Kevorkian stemming from his assistance in O'Keefe's suicide.

The Wayne County Prosecutor appealed both cases. The appeals were consolidated and in 1994, the Michigan Court of Appeals held that the assisted suicide statute, by creating a commission to study issues related to voluntary termination of life, with or without assistance, and specifically criminalized assisted suicide, violated the "one-object" provision of the Michigan Constitution. However, the appellate court also found that there is no constitutional right to commit suicide. *Hobbins v. Attorney General,* 205 Mich.App. 194, 518 N.W.2d 487 (1994).

The Michigan Supreme Court granted leave to appeal and held that (1) the assisted suicide statute was validly enacted and did not violate the one object clause of the Michigan Constitution; (2) the United States Con-

---

**2.** That statute has now expired.

stitution does not prohibit states from imposing criminal penalties for assisting someone in committing suicide; and (3) assisted suicide is a common law crime in Michigan which may be prosecuted under the common-law savings statute, M.C.L. § 750.505. *People v. Kevorkian,* 447 Mich. 436, 527 N.W.2d 714 (1994). Kevorkian petitioned the United States Supreme Court seeking to overturn the Michigan Supreme Court's decision. The United States Supreme Court denied that petition for certiorari. *Kevorkian v. People,* —— U.S. ——, 115 S.Ct. 1795, 131 L.Ed.2d 723 (1995).

Meanwhile, following Kevorkian's assistance with the June 1990 suicide of Janet Adkins, on February 5, 1991, (i.e., before the Wantz/Miller suicides which gave rise to the first charges filed against Kevorkian) the Oakland County Circuit Court (Gilbert, J.) entered an "Order of Permanent Injunction", permanently enjoining "Dr. Jack Kevorkian, his agents, and employees, and those in active concert with him ... from: using, employing, administering, offering, or providing any of his 'suicide machines', or other similar devices, contrivances, or other modalities or drugs (including nonprescription drugs) on, or to, any persons seeking to end a human life, or conducting any acts to help a patient commit suicide regardless of the modality employed." *People v. Kevorkian,* Oakland County Cir.Ct. No. 90–390963–NZ.

In May of 1995, after the Michigan Supreme Court issued its ruling finding assisted suicide to be a crime at common law, the Michigan Court of Appeals affirmed the circuit court's imposition of the permanent injunction. *People v. Kevorkian,* 210 Mich. App. 601, 534 N.W.2d 172 (1995). The Michigan Supreme Court denied leave to appeal. *People v. Kevorkian,* 549 N.W.2d 566 (1996). Kevorkian subsequently petitioned the U.S. Supreme Court for certiorari. *See People v. Kevorkian,* 65 U.S.L.W. 3086 (7/25/96). That petition was pending when this federal action was filed. The petition for certiorari was denied on October 15, 1996, i.e., after oral argument on the parties' cross-motions for summary judgment in this action was completed. *Kevorkian v. People,* —— U.S. ——, 117 S.Ct. 296, 136 L.Ed.2d 215 (1996).

In his cert petition, Kevorkian argued that (1) the injunction's prohibitions against "offering" or "conducting any acts to help a patient commit suicide" impermissibly burdens First Amendment rights; (2) a mentally competent terminally ill adult has a constitutional right to commit suicide which is protected by the Ninth and Fourteenth Amendments; and (3) the Equal Protection Clause of the Fourteenth Amendment is violated by premising the freedom to choose to hasten death on the basis of whether a disease requires the use of life sustaining treatment.

### PLAINTIFFS' REQUEST FOR INJUNCTIVE RELIEF IN THIS ACTION

Kevorkian and his co-plaintiff in this action, Janet Good, seek a court order precluding the Oakland County Prosecutor from prosecuting Kevorkian for any other suicides which he has assisted (or may assist) or at which he was or is present, including the death of Lois Howe whose suicide is referenced in Plaintiffs' Amended Complaint in this action.[3] Kevorkian and Good claim that an injunction is necessary because other suicides at which Dr. Kevorkian was present—including Ms. Howe'—are under police investigation and that Richard Thompson "is threatening to file charges" in the Howe case. It is on the basis of alleged "ongoing police investigations" and the alleged threatened initiation of charges against Dr. Kevorkian for the death of Lois Howe that Kevorkian claims he has standing to pursue the

---

**3.** Although Lois Howe's September 26, 1992 suicide is the only suicide specifically referenced in Plaintiffs' First Amended Complaint, a number of Plaintiffs' claims and indeed, a number of the arguments of Plaintiffs' counsel in his briefs and in oral argument are "global" arguments, i.e., that Kevorkian should not be prosecuted for having assisted in any suicides in the past or for assisting in any suicides in the future. Accordingly, when necessary, the Court will also address the issues raised in this case, both globally

injunctive and declaratory judgment relief he seeks in this action.[4]

## POST–HEARING DEVELOPMENTS

Following completion of oral argument in this case, on October 29, 1996, after the United States Supreme Court denied Kevorkian's petition for a writ of certiorari on October 15, 1996 and allowed the Permanent Injunction entered by the Oakland County Circuit Court in February 1991 to stand, the Oakland County Prosecutor submitted to the Oakland County Circuit Court an *ex parte* motion for an order to show cause why Jack Kevorkian should not be held in criminal contempt of court for violating the permanent injunction. That show cause order is still pending.

Then, on October 31, 1996, a 20–count criminal complaint was filed in Oakland County against Jack Kevorkian and others for assisting and conspiring to assist in several suicides between June 20, 1996 and September 7, 1996, in violation of Michigan common law and M.C.L. § 750.505 (i.e., the laws challenged in this action). Janet Good is named, but not charged, as a co-conspirator in that Oakland County criminal complaint.[5]

In light of the foregoing post-hearing developments, the Court entered an Order on November 6, 1996 directing counsel for the parties to submit supplemental briefs addressing the effect of these developments on the parties' previously-asserted legal arguments. Supplemental briefing was completed on November 19, 1996.

Having reviewed and considered all of the parties' briefs and supporting documents

filed in this matter, and having further considered the oral arguments of counsel at the hearing held on September 26–30, 1996, the Court is now prepared to rule on the parties' cross-motions for summary judgment. This Opinion and Order sets forth that ruling.

## FACTUAL BACKGROUND

Plaintiff Jack Kevorkian is a well-known advocate of the right to die and the right to physician-assisted suicide. He has previously been prosecuted in Oakland County for his assisted suicide activities, and was acquitted in each instance. He has admitted assisting in numerous suicides both prior to, and after, his last prosecution.

Plaintiff Janet Good is the former president of the Michigan Hemlock Society. According to Plaintiffs' Amended Complaint, Ms. Good suffers from terminal pancreatic cancer. She alleges in this action that "if she seeks to obtain the assistance of a physician to end her pain and suffering, she faces indictment as a co-conspirator." [Amended Complaint, ¶ 21.]

Although the parties have not included any sufficient "statement of facts" in their briefs to provide a description of specific conduct which allegedly gives rise to the potential prosecutions which Plaintiffs seek to preclude, at oral argument, Plaintiffs' counsel stipulated that Plaintiff Kevorkian's conduct in assisting in a suicide "generally" is the conduct described in the reported Michigan Court of Appeals and Supreme Court decisions concerning him.[6] This "general" con-

and specifically as they apply to Ms. Howe's death in 1992.

4. With respect to Kevorkian's co-plaintiff, Janet Good, her "standing" argument is bootstrapped onto Kevorkian's. She claims that "[a]s a result of the purported criminalization of physician aid in dying under an unwritten common law, Mrs. Good is denied constitutional rights under the privacy and liberty provisions of the United States Constitution for she is prevented from seeking and/or obtaining physician aid in dying." [Amended Complaint, ¶ 11.] She re-phrases this standing argument in Plaintiffs' Brief, and alleges that the common law under which Kevorkian was last prosecuted "mak[es] it a crime for [her] to seek and/or obtain physician aid in dying give rise to the Plaintiffs' standing to bring this ac-

tion." [Plaintiffs' Brief. p. 2–3.] According to Plaintiffs, the existence of this common law and the threat of future prosecution of Dr. Kevorkian confer them both with standing to pursue the declaratory and injunctive relief they seek.

5. Good was subsequently charged, along with Kevorkian, by an Ionia County Grand Jury on November 6, 1996 for assisting in a suicide with Kevorkian in that county in August 1996.

6. The Court asked counsel for the parties to submit a stipulated statement of facts following the September 30 hearing. However, the only fact to which the parties were able to stipulate was that there were no criminal prosecutions against Plaintiff Kevorkian pending as of that date.

duct was described by Plaintiff Kevorkian, himself, on the record on June 8, 1990, in connection with the Oakland County Prosecutor's request for a preliminary injunction to enjoin Kevorkian from further assisting in suicides following the suicide of Janet Adkins, and reported in *People v. Kevorkian, supra,* 534 N.W.2d 172:

> Defendant [Kevorkian] admitted that he helped Ms. Adkins commit suicide by means of his "suicide machine," which consists of a frame holding three chemical solutions fed into a common intravenous line controlled by a switch and a timer. Defendant admitted that he inserted the intravenous line needle into Ms. Adkins' arm, but testified that Ms. Adkins activated the switch that turned on the machine. . . .

*Id.* at 173–74.

Kevorkian's conduct in connection with the deaths of Sherry Miller and Marjorie Wantz was described by the Michigan Supreme Court in *People v. Kevorkian, supra,* 527 N.W.2d 714:

> According to the testimony presented at the defendant's preliminary examination, the plan was to use his "suicide machine". The device consisted of a board to which one's arm is strapped to prevent movement, a needle to be inserted into a blood vessel and attached to IV tubing, and containers of various chemicals that are to be released through the needle into the bloodstream. Strings are tied to two of the fingers of the person who intends to die. The strings are attached to clips on the IV tubing that control the flow of the chemicals. As explained by one witness, the person raises that hand, releasing a drug

called methohexital, which was described by expert witnesses as a fast-acting barbiturate that is used under controlled circumstances to administer anesthesia rapidly. When the person falls asleep the hand drops, pulling the other sting, which releases another clip and allows potassium chloride to flow into the body in concentrations sufficient to cause death.

> The defendant tried several times, without success, to insert the suicide-machine needle into Ms. Miller's arm and hand. He then left the cabin, returning several hours later with a cylinder of carbon monoxide gas and a mask apparatus. He attached a screw driver to the cylinder, and showed Ms. Miller how to use the tool as a lever to open the gas valve.

> The defendant then turned his attention to Ms. Wantz. He was successful in inserting the suicide-machine needle into her arm. The defendant explained to Ms. Wantz how to activate the device so as to allow the drugs to enter her blood stream. The device was activated and Ms. Wantz died.[7]

> The defendant then placed the mask apparatus on Ms. Miller. The only witness at the preliminary examination who was present at the time said that Ms. Miller opened the gas valve by pulling on the screw driver. The cause of her death was determined to be carbon-monoxide poisoning.

*Id.* at 733–34.

The Court will use these "general" descriptions of Kevorkian's assisted suicide activities as the factual context for its decision in this matter.

---

7. The Michigan Supreme Court noted that no one who testified at the preliminary examination actually witnessed the activation of the suicide device. The only persons in the cabin at the time were the two decedents, Jack Kevorkian, and Kevorkian's sister, who since has died. Mr. Wantz's husband was walking away from the cabin where the deaths occurred. He testified as follows:

Q: You don't know who pulled the string?
A: I have no idea. She knew that she had to pull the string when I left.
Q: You don't know if she tried to pull the string and it didn't work and Kevorkian pushed her hand at all, do you?

A: I can say this, when I left the room she was in the process of trying to pull the string.

\* \* \* \* \* \*

Q: You don't know who pulled the string? That's what you're telling me?
A: I can tell you she was in the process of trying to pull the sting when I left the room, but I did not see her pull the string. The only thing I can . . . tell you is once I left the room, Dr. Kevorkian did—I heard Dr. Kevorkian say, "Marj, you have to hold your hand up," and that is the only thing I know.

527 N.W.2d at 734, n. 62.

*DISCUSSION*

In seeking summary judgment/dismissal, Defendant Thompson has argued:

(1) that Plaintiffs' complaint should be dismissed on justiciability/jurisprudential grounds (a) for lack standing, (b) by application of the *Younger* [8] abstention rule, and (c) by application of the *Rooker–Feldman* [9] doctrine; and

(2) for lack of merit of Plaintiffs' substantive arguments of unconstitutional vagueness, and due process and equal protection violation.

The Court will address each of these issues *seriatim.*

### A. *STANDING*

A plaintiff's standing is a jurisdictional matter for Article III courts, and thus, is a threshold question to be resolved before the court may address any substantive issues. *Linda R.S. v. Richard D.,* 410 U.S. 614, 615, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973); *O'Shea v. Littleton,* 414 U.S. 488, 493, 94 S.Ct. 669, 675, 38 L.Ed.2d 674 (1974); *Planned Parenthood Ass'n v. City of Cincinnati,* 822 F.2d 1390, 1394 (6th Cir.1987).

Article III, section 2 of the United States Constitution confines federal court jurisdiction to "cases" and "controversies". The case-or-controversy requirements or Article III, however, are not satisfied merely because a party requests a court of the United States to declare his legal rights. *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 471, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). As the Supreme Court explained in *Valley Forge:*

> The judicial power of the United States defined by Art. III is not an unconditioned authority to determine the constitutionality of legislative or executive acts. The power to declare the rights of individuals and to measure the authority of governments, this Court said 90 years ago, "is legitimate only in the last resort, and as a necessity in the

determination of real, earnest, and vital controversy." Otherwise the power "is not judicial ... in the sense in which judicial power is granted by the Constitution to the courts of the United States."

> As an incident to the elaboration of this bedrock requirement, this Court has always required that a litigant have "standing" to challenge the action sought to be adjudicated in the lawsuit.

*Id.*

Examination of the standing issue involves two levels of inquiry. The first level of inquiry is whether the plaintiff has shown, "at an irreducible minimum", some actual or threatened injury resulting from the putatively illegal action. *Valley Forge, supra; O'Shea v. Littleton, supra; Planned Parenthood Ass'n v. City of Cincinnati, supra.* The second inquiry involves considering whether, as a prudential matter, the plaintiff is the proper proponent of the rights on which the action is based. *Singleton v. Wulff,* 428 U.S. 106, 111–13, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976).

To satisfy the "injury" requirement of the first level of constitutional inquiry, it is not enough for the plaintiff to assert some abstract injury. It must be demonstrated that the plaintiff "has sustained or is immediately in danger of sustaining some direct injury" as a result of the challenged statute or official conduct. *Massachusetts v. Mellon,* 262 U.S. 447, 488, 43 S.Ct. 597, 601, 67 L.Ed. 1078 (1923); *Valley Forge, supra,* 454 U.S. at 476–78, 102 S.Ct. at 761. The injury or threat of injury must be both "real and immediate" not "conjectural" or "hypothetical". *O'Shea v. Littleton, supra.*

■ In this case, although it is conceded that there have been no charges for assisting with the suicide of Lois Hawes brought or threatened against Dr. Kevorkian, and no charges were pending or threatened against him when this case was filed, the cases involving attempts to enjoin prosecutions in which no "case or controversy" injury was

---

**8.** *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

**9.** *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983).

found seem to hinge on the fact that there was nothing to suggest that the plaintiffs in those cases would again engage in any conduct that would violate the laws they were challenging. *See, Eggar v. City of Livingston,* 40 F.3d 312, 316 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2566, 132 L.Ed.2d 818 (1995); *Knox v. McGinnis,* 998 F.2d 1405, 1412–15 (7th Cir.1993); *Johnson v. Moore,* 958 F.2d 92, 94–95 (5th Cir.1992). By contrast, Dr. Kevorkian has openly continued to assist with suicides, and he has asserted that he will continue to do so. *See, People v. Kevorkian,* 534 N.W.2d at 173–74.

More importantly, the Supreme Court has held that when prosecution seems apparent, a litigant need not first expose himself to actual arrest or prosecution to be entitled to challenge the constitutionality of a statute. *See, Steffel v. Thompson,* 415 U.S. 452, 457–58, 94 S.Ct. 1209, 1215, 39 L.Ed.2d 505 (1974). The Court further stated in *Babbitt v. United Farm Workers National Union,* 442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) that when a plaintiff "has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder, he 'should not be required to await and undergo a criminal prosecution as the sole means of seeking relief.'" *Id.* at 298, 99 S.Ct. at 2309, quoting *Doe v. Bolton,* 410 U.S. 179, 188, 93 S.Ct. 739, 745, 35 L.Ed.2d 201 (1973).

Relying on *Babbitt,* in *Quill v. Vacco,* 80 F.3d 716, 722–23 (2nd Cir.1996), *cert. granted,* —— U.S. ——, 117 S.Ct. 36, 135 L.Ed.2d 1127 (1996) and *Compassion in Dying v. State of Washington,* 79 F.3d 790, 794–97 (9th Cir.1996) (en banc), *cert. granted,* —— U.S. ——, 117 S.Ct. 37, 135 L.Ed.2d 1128 (1996), both the Second Circuit and Ninth Circuit determined that physician and patient plaintiffs had presented a sufficiently justiciable case or controversy to withstand Article III standing scrutiny. As in this case, the *Quill* and *Compassion in Dying* plaintiffs were challenging state laws which criminalized assisting in a suicide.

The Court in this case similarly finds that the case or controversy "injury" requirement is met. Although no criminal charges against Kevorkian were pending when this action was filed, as indicated above, an injunction in aid of the criminal law covering Kevorkian and his assisted suicide activities was at the time of filing, and remains now, in place. Furthermore, criminal charges have recently been filed against Kevorkian in Oakland and Ionia counties, and those criminal prosecutions are still pending.

As indicated above, however, the finding of a case or controversy "injury" does not end the Article III standing inquiry. The second level of inquiry is whether Kevorkian and/or Good are the proper parties to assert the rights claimed in Plaintiffs' Amended Complaint.

The Sixth Circuit explained the standards applicable to this second level of inquiry in *Planned Parenthood Ass'n v. City of Cincinnati, supra:*

> One of the standards relevant to this second question is the well-established principle that a plaintiff "generally must assert his own legal rights and interests and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth [v. Seldin],* 422 U.S. [490], 499, 95 S.Ct. [2197], 2205 [45 L.Ed.2d 343] [(1975)]. There are exceptions to this rule, however, under which litigants have been permitted to assert the rights of third parties. There are essentially two types of cases involving *jus tertii* standing. The first is where the litigants challenge statutes which regulate their activity and, as a result, violate the rights of third parties. Plaintiffs in this type of case have uniformly been permitted to assert the rights of the affected third parties. *See Craig v. Boren,* 429 U.S. 190, 194–97, 97 S.Ct. 451, 455–57, 50 L.Ed.2d 397 (1976); *Eisenstadt v. Baird,* 405 U.S. 438, 443–46, 92 S.Ct. 1029, 1033–35, 31 L.Ed.2d 349 (1972). The second genre of *jus tertii* cases involve litigants seeking to assert solely the rights of third parties as being impinged by a statute. *Jus tertii* standing in this type of case is more difficult to establish, and generally depends on two factual elements. The first is whether the litigant's relationship with the third party whose right he

seeks to assert is such that "the enjoyment of the right is inextricably bound up with the activity the litigant wishes to pursue." *Singleton [v. Wulff]*, 428 U.S. [106] at 114; 96 S.Ct. [2868] at 2874 [49 L.Ed.2d 826] [ (1976) ]. The second is whether the third party is not able to assert the affected right on his own behalf. *Id.* at 115–16, 96 S.Ct. at 2874–75.

822 F.2d at 1394. *See also, Volunteer Medical Clinic, Inc. v. Operation Rescue*, 948 F.2d 218, 222–23 (6th Cir.1991).

*Volunteer Medical Clinic* and *Planned Parenthood*, as well as the cases cited in the above-quoted excerpt from that case, all deal with statutes and ordinances regulating abortion and contraceptives, and the potential prosecution of doctors, hospitals and abortion clinics under those statutes. In these cases, the Supreme Court and the Sixth Circuit have uniformly held that doctors have standing "to assert the rights of women patients as against governmental interference with the abortion decision." *Singleton v. Wulff, supra. Accord Doe v. Bolton*, 410 U.S. 179, 188, 93 S.Ct. 739, 745–46, 35 L.Ed.2d 201 (1973).

It is this "physician-patient" standing that the courts found in *Compassion in Dying* and *Quill v. Vacco*, and it is this same derivative doctor-patient standing that Plaintiff Kevorkian asserts in this case. *See* Plaintiffs' Amended Complaint, ¶ 25. ("It is a well established constitutional principle that physicians have standing to assert the constitutional rights of their patients.")

Defendant argues that Kevorkian is not entitled to assert this physician-patient standing because he is *not* a licensed physician. His medical license has been suspended and he is no longer authorized to practice medicine in Michigan. However, as Plaintiffs' counsel pointed out at oral argument, the Michigan common law at issue here does not only criminalize *physician*-assisted suicide. The Michigan law sweeps even more broadly than the laws challenged in the abortion cases because it precludes assistance in a suicide by *anyone*, not only licensed physicians. Thus, that Kevorkian is not a licensed physician is irrelevant for standing purposes in this case, and the Court accordingly finds

that Kevorkian may derivatively assert the constitutional rights of his terminally ill clients.

■ The Court also finds that Plaintiff Janet Good has standing to pursue this action. As alleged in Plaintiffs' Amended Complaint, Ms. Good, herself, is terminally ill and she has asserted her desire to seek assistance in dying. Thus, the constitutional infirmities which are alleged in the complaint directly affect her rights. Moreover, Ms. Good arguably is also covered by the Oakland County injunction to the extent that it covers not only Kevorkian but also "his agents, employees and those in active concert with him from conducting any acts to help a patient commit suicide". Furthermore, during the pendency of this action, Ms. Good, herself, has been charged in a criminal indictment in Ionia County for assisting in a suicide under the very law challenged in this action.

Based on the foregoing discussion, the Court rejects Defendant Thompson's argument that this case should be dismissed for lack of Article III standing.

**B. · *YOUNGER ABSTENTION***

■ Defendant Thompson also argues that even if the Court is satisfied that Plaintiffs have standing to pursue this action, the Court should nonetheless abstain from granting the relief sought by Plaintiffs under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). *See Ohio Civil Rights Commission v. Dayton Christian Schools*, 477 U.S. 619, 625, 106 S.Ct. 2718, 2722, 91 L.Ed.2d 512 (1986) (finding that a ripe controversy existed between the parties but determining that the district court should have abstained from adjudicating the case under *Younger v. Harris* ).

In *Younger v. Harris*, the United States Supreme Court held that federal courts should not enjoin pending state criminal proceedings except in a "very unusual circumstance" where an injunction is necessary to prevent "both great and immediate" irreparable injury. *Id.*, at 44–46, 106 S.Ct. at 751. Grounded on principles of equity and on the "more vital consideration" of the concerns for

comity and federalism, *id.* at 42–44, 106 S.Ct. at 750, the *Younger* court found it

> perfectly natural for our cases to repeat time and time again that the *normal* thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions.

*Id.* at 45, 91 S.Ct. at 751.

The Court explained that federal courts must be sensitive to "the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the states." *Id.* at 44, 91 S.Ct. at 750. Thus, the *Younger* court found the possible unconstitutionality of a statute does not justify an injunction against good faith efforts of the state to enforce it. *Id.* at 53–57, 91 S.Ct. at 755.

*Younger* established the principle that in cases seeking to enjoin ongoing state proceedings—be they criminal, civil, or administrative—federal courts should not exercise jurisdiction but should instead dismiss the cases in their entirety. *See Gibson v. Berryhill,* 411 U.S. 564, 577, 93 S.Ct. 1689, 1697, 36 L.Ed.2d 488 (1973); *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *Ohio Civil Rights Commission v. Dayton Christian Schools, supra.* The abstention rule announced in *Younger* with respect to injunctive relief applies with equal force to requests for declaratory relief in federal courts. *Samuels v. Mackell,* 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971). *See also, Younger, supra,* 401 U.S. at 41 n. 2, 91 S.Ct. at 749 n. 2.

In determining the applicability of the *Younger* abstention rule, the court should consider three factors: (1) whether there is a pending state proceeding; (2) whether an adequate opportunity is provided to raise the constitutional claims in the state proceeding; and (3) whether there are extraordinary circumstances which nevertheless warrant federal intervention. *Zalman v. Armstrong,* 802 F.2d 199, 202 (6th Cir.1986).

If a state action is pending when the federal complaint was filed, the federal action must be dismissed. *Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975). As indicated above, the Supreme Court has held that this rule applies not only to pending criminal prosecutions, but also, it applies with to civil proceedings in aid of the criminal law, *Huffman, supra;* a state civil contempt proceeding, *Juidice v. Vail,* 430 U.S. 327, 97 S.Ct. 1211, 51 L.Ed.2d 376 (1977), or a civil enforcement action brought by the state. *Trainor v. Hernandez,* 431 U.S. 434, 97 S.Ct. 1911, 52 L.Ed.2d 486 (1977). Moreover, it is well-settled that for *Younger* purposes, the state's "trial-and-appeals process is treated as a unitary system, and for a federal court to disrupt its integrity by intervening midprocess would demonstrate a lack of respect for the state as a sovereign." *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans,* 491 U.S. 350, 369, 109 S.Ct. 2506, 2519, 105 L.Ed.2d 298 (1989).

Furthermore, even if no state prosecution is pending when the federal action is filed, if a state prosecution is initiated after the federal action is filed, the *Younger* abstention rule still may apply. In *Hicks v. Miranda, supra,* the Supreme Court held

> [W]here state criminal proceedings are begun against the federal plaintiffs after the federal complaint is filed but before any proceedings of substance on the merits have taken place in the federal court, the principles of *Younger v. Harris* should apply in full force ... absent satisfactory proof of those extraordinary circumstances calling into play one of the limited exceptions to the rule of *Younger.* ...

422 U.S. at 349–50, 95 S.Ct. at 2292.

With respect to Dr. Kevorkian, although it is true that there were no criminal prosecutions pending against him in Oakland County when the federal complaint was filed, there has been litigation concerning the permanent injunction imposed by the Oakland County Circuit Court in 1991 pending at the appellate level throughout the pendency of this action. That injunction is a state civil proceeding "in aid of the criminal law" under *Huffman,* and its progeny, and therefore

subject to *Younger*. *See People v. Kevorkian, supra*, 210 Mich.App. at 607, 534 N.W.2d 172 (finding the permanent injunction was necessary, because with respect to Dr. Kevorkian, "recourse to the criminal courts alone may not be adequate to restrain unlawful acts or threats thereof.") Although Plaintiff Kevorkian's appeal of the injunction ended with the October 15, 1996 denial by the Supreme Court of his petition for a writ of certiorari, on October 29, 1996, i.e., during the pendency of this federal action, the Oakland County Prosecutor initiated contempt proceedings against Kevorkian by filing a motion for an order to show cause why Plaintiff Kevorkian should not be held in criminal contempt and, accordingly, fined and incarcerated, for violating the injunction by assisting in four suicides in August and September 1996. [See Defendant's Supplemental Pleading and Additional Facts, Ex. A.] Two days later, on October 31, 1996, a 20-count criminal complaint was filed against Kevorkian in Oakland County for violating the Michigan common law and M.C.L. § 750.505 by assisting in ten suicides from June through September 1996. Both the criminal contempt proceedings and the 20-count criminal complaint are still pending in Oakland County.

By virtue of these "ongoing" criminal proceedings in Oakland County, the Court finds the first *Younger* element satisfied with respect to Dr. Kevorkian.

The second factor for applying *Younger* abstention is whether the pending state proceedings implicate an important state interest. The proper analysis of this issue is not to look merely to the interest in the outcome of the *particular* case, but to the importance of the generic proceedings to the state. *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. at 364–65, 109 S.Ct. at 2516–17. *See also, Pennzoil Company v. Texaco, Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987). Where the requested federal injunction would interfere with the execution of state judgments or contravene a state's interest in its contempt process, *Younger* applies. *Juidice v. Vail, supra*. *See also, Middlesex County Ethics Committee v. Garden State Bar Association*, 457 U.S. 423, 102 S.Ct. 2515, 73 L.Ed.2d 116 (1982); *Moore v. Sims*, 442 U.S. 415, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979). The Supreme Court has further held that where the state proceedings involve the state's criminal law, a paramount state interest is implicated. *Huffman, supra*, 420 U.S. at 603–05, 95 S.Ct. at 1208. *See also, O'Neill v. City of Philadelphia*, 32 F.3d 785, 791–92 (3rd Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1355, 131 L.Ed.2d 213 (1995).

The pending contempt proceeding and criminal charges against Kevorkian implicate these important state interests. The Oakland County injunction prohibits Kevorkian from assisting anyone to commit suicide. *People v. Kevorkian, supra*, 210 Mich.App. 601, 534 N.W.2d 172. The Michigan Court of Appeals ruling—which the U.S. Supreme Court let stand—was premised on the fact that assisted suicide is illegal and amounts to criminal conduct in Michigan. *Id.* at 605–608, 534 N.W.2d 172. The Court of Appeals concluded that Kevorkian's actions "implicate criminal law". *Id.* at 608, 534 N.W.2d 172.

The third requirement for *Younger* abstention, i.e., that there be an adequate opportunity in the state proceedings to raise constitutional challenges, is also satisfied in this case. Abstention is appropriate unless state law clearly precludes the interposition of the constitutional claims. *Moore, supra*, 442 U.S. at 426–28, 99 S.Ct. at 2379. The burden rests on the federal plaintiff to show that state procedure bars the interposition of the constitutional claims. *Pennzoil Company, supra*, 481 U.S. at 12, 107 S.Ct. at 1527. *See also, Fieger v. Thomas*, 74 F.3d 740, 745–46 (6th Cir.1996).

Kevorkian has not made such a showing here. In fact, the petition for writ of certiorari filed by Plaintiff Kevorkian in the course of his appeal of the Oakland County Circuit Court's imposition of the injunction raised several of the very same constitutional issues raised in this action. Kevorkian argued in his cert petition that constitutionally cognizable privacy and liberty interests encompass the right of a mentally competent terminally ill or suffering adult to hasten his/her own death and that it is a denial of equal protection to permit persons on life support to hasten their death while denying this right to

those suffering from terminal illness or intractable pain who are not on life support. [Petition for Writ of Certiorari, Defendant's Ex. E.]

Kevorkian also is challenging the injunction on the basis that it is overbroad. *Id.* While it is true that Kevorkian did not raise in that petition the argument that the common law savings clause is unconstitutionally vague, overbroad and amounts to an *ex post facto* law, he will clearly have an adequate opportunity to raise these federal constitutional claims in the pending Oakland County contempt and criminal proceedings. Therefore, the Court finds that the third requirement of *Younger* abstention is met.

██ Once a court determines that the requirements for *Younger* abstention are met in a given case, generally the plaintiff's claims will be dismissed unless the plaintiff can show that one of the exceptions applies. Federal courts will hear a case in which *Younger* applies only in "extraordinary circumstances", *id.* at 53, 91 S.Ct. at 755, such as official harassment and bad faith. *Hicks v. Miranda, supra,* 422 U.S. 332, 342–52, 95 S.Ct. 2281, 2292–93. Bad faith generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction. *Kugler v. Helfant,* 421 U.S. 1017, 95 S.Ct. 2425, 44 L.Ed.2d 686 (1975). Animus or ill will between the parties does not, by itself, place a case within this narrow exception to *Younger* abstention. *Phelps v. Hamilton,* 59 F.3d 1058, 1067 (10th Cir.1995). Nor does the fact that several unsuccessful prosecutions have already been brought against the federal plaintiff. *Cameron v. Johnson,* 390 U.S. 611, 617–18, 88 S.Ct. 1335, 1338, 20 L.Ed.2d 182 (1968); *Younger, supra,* 401 U.S. at 46–48, 91 S.Ct. at 752. *See also Dombrowski v. Pfister,* 380 U.S. 479, 482, 85 S.Ct. 1116, 1118, 14 L.Ed.2d 22 (1965). This is particularly true where prosecuting officials rely on judicial authorization for their conduct. *Hicks, supra,* 422 U.S. at 351–52, 95 S.Ct. at 2293.

Here, although there is clearly ill will between the parties, and perhaps even animus, the Court cannot say that the prosecutions against Kevorkian have been brought in bad faith in the sense that the prosecutor did not have a reasonable expectation of a valid conviction. The fact that previous prosecutions have been unsuccessful does not establish bad faith as to future prosecutions; each of those prior acquittals have turned on the particular facts of those cases, and the Defendant prosecutor has proceeded on legal theories supported, at least on their face, by statute and applicable case precedent.

██ Nor does Kevorkian come within the ambit of a second recognized exception to *Younger* abstention, that the challenged statute "is flagrantly and patently violative of express constitutional prohibitions in every clause, sentence and paragraph, and in whatever manner and against whomever an effort might be made to apply it." *Younger,* 401 U.S. at 53–54, 91 S.Ct. at 755. Kevorkian's challenge to the common law savings statute does not fall within this category, and Plaintiffs' counsel has provided no authority that would support such a proposition. Further, Plaintiffs' suggestion that the common law savings statute has a "chilling effect" on the exercise of their constitutional rights does not place this case within an exception to *Younger.* The *Younger* court held that a "chilling effect", even in the area of first amendment rights (which the Supreme Court has historically vehemently protected), has never been considered a sufficient basis, in and of itself, for enjoining state action. 401 U.S. at 50–53, 91 S.Ct. at 754. *See also, Fieger v. Thomas, supra,* 74 F.3d at 750.

Based on foregoing discussion, and by application of *Younger v. Harris* and its progeny, the Court finds that it must abstain from adjudicating Plaintiff Kevorkian's claims in this action. Therefore, the Court will not enjoin Defendant Thompson from proceeding with the ongoing contempt and criminal charges against Kevorkian.

██ However, the Court's abstention decision with respect to Plaintiff Kevorkian and his requested injunction against the Oakland County Prosecutor does not resolve this action in its entirety because there remains a second Plaintiff, Janet Good, and her request for a declaratory judgment. There have never been, nor are there are now, any criminal proceedings pending in Oakland County

against Ms. Good. While the Court is aware of reports that criminal charges were filed against Ms. Good during the pendency of this action, those charges were brought by the *Ionia* County Prosecutor, not the Defendant Oakland County Prosecutor, and those charges were not filed until more than a month after oral argument and briefing in this federal proceeding was completed. Therefore, the new Ionia County indictment cannot be considered an "ongoing proceeding" for purposes of *Younger* abstention. *See, Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45 L.Ed.2d 648 (1975); *Sullivan v. City of Pittsburgh,* 811 F.2d 171, 177–78 (3d Cir.1987), *cert. denied,* 484 U.S. 849, 108 S.Ct. 148, 98 L.Ed.2d 104 (1987) (where no state proceeding against federal plaintiff pending at time of filing of federal action, and subsequently-filed state action was brought by a party other than the federal defendant, abstention is inappropriate).

Therefore, the Court will proceed to address the remaining arguments raised by Defendant Thompson with respect to Plaintiff Good.

## C. *THE ROOKER–FELDMAN DOCTRINE*

■ Defendant Thompson has argued that even if the Court finds that *Younger* does not mandate dismissal of Plaintiffs' complaint in its entirety, to the extent that Plaintiffs in effect seek a reversal of either (1) the Michigan Supreme Court's decision determining that assisted suicide is a common law crime, subject to prosecution under the common law savings statute, and/or (2) the Michigan Court of Appeals' subsequent affirmance of the imposition of a permanent injunction issued in aid of the criminal law and its reaffirmation that assisted suicide is illegal in Michigan, federal courts lack appellate jurisdiction over state court judgments in connection with modifying them or vacating them. *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); *District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983); *Rhoades v. Penfold,* 694 F.2d 1043 (5th Cir.1983). The *Rooker–Feldman* doctrine stands for the proposition that a federal district court may not hear what is effectively an appeal of a case already litigated in state court. *United States v. Owens,* 54 F.3d 271, 274 (6th Cir.1995), *cert. dismissed,* —— U.S. ——, 116 S.Ct. 492, 133 L.Ed.2d 418 (1995). The rule precludes federal jurisdiction when a federal constitutional challenge is "inextricably intertwined" with claims asserted in a state court proceeding. *Keene Corp. v. Cass,* 908 F.2d 293 (8th Cir.1990). As the U.S. Supreme Court explained in *Pennzoil Co. v. Texaco, Inc., supra:*

> The federal claim is inextricably intertwined with the state-court judgment if the federal claim succeeds only to the extent that the state court wrongly decided the issues before it. Where federal relief can only be predicated upon a conviction that the state court was wrong, it is difficult to conceive the federal proceedings as, in substance, anything other than a prohibited appeal of the state court judgment.

*Id.,* 481 U.S. at 25, 107 S.Ct. at 1533.

However, a party cannot be said to be appealing a decision by a state court when she was not a party to the state action. *United States v. Owens, supra,* 54 F.3d at 274. As the Sixth Circuit observed in *Owens,* "A person who was not a party in the state court action did not have an opportunity to litigate its [sic] claims. That person must be allowed to bring an action in federal court to attempt to vindicate its perceived rights, otherwise it will have no opportunity to do so." *Id.* Because the federal plaintiff was not a party to the state court action in *Owens,* the Sixth Circuit determined that *Rooker–Feldman* did not preclude the federal district court from exercising its jurisdiction to decide the merits of the federal plaintiff's claims. *See also, Valenti v. Mitchell,* 962 F.2d 288, 297 (3rd Cir.1992) (*Rooker–Feldman* does not apply to bar a suit in federal court brought by a party that was not a party in the preceding action in state court); *Leaf v. Supreme Court of Wisconsin,* 979 F.2d 589, 597–98 (7th Cir.1992), *cert. denied,* 508 U.S. 941, 113 S.Ct. 2417, 124 L.Ed.2d 639 (1993) (*Rooker–Feldman* doctrine does not bar action by a party against whom there is no state court judgment).

The foregoing authorities make clear that the *Rooker–Feldman* doctrine does not apply to Plaintiff Janet Good in this action. Ms. Good was never a party in any of the state court actions involving Jack Kevorkian and his challenges of Michigan's assisted suicide laws.[10] Therefore, the Court will proceed to address the merits of Plaintiff Good's constitutional claims in this action.

## THERE IS NO COGNIZABLE CONSTITUTIONAL RIGHT TO ASSISTED SUICIDE

 In Count II of their Amended Complaint, Plaintiffs contend that there is a constitutional right to assisted suicide. Plaintiffs' argument that a mentally competent adult has a protected liberty interest to a physician assisted suicide under the Due Process Clause of the Fourteenth Amendment is based primarily upon Supreme Court decisions concerning abortion, *e.g.*, *Planned Parenthood v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1990), and withdrawal of life support, *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). Thus, Plaintiffs' specifically attack the Michigan Supreme Court's ruling that these cases do not suggest any inclination on the part of the Supreme Court to expand the notion of constitutionally protected liberty interests to encompass a right to suicide: "[Such] a right is not expressly recognized anywhere in the United States Constitution, or in the decisions of the United States Supreme Court,

and cannot be reasonably inferred." *People v. Kevorkian, supra*, 527 N.W.2d at 732.

In *Cruzan*, the Court considered whether a severely ill or injured person has a constitutional right to request a hospital to withdraw life-sustaining treatment; whether the right could be exercised on behalf of the patient by her parents; and whether the exercise of the right was unduly hampered by an evidentiary ruling imposed by the Missouri state court, precluding the admission into evidence of statements made by Cruzan to her former housemate that she would not wish to continue her life if she were sick or seriously injured unless she could live at least halfway normally.

In resolving these issues, the Supreme Court acknowledged that "the principle that a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment *may* be inferred from our prior decisions." 497 U.S. at 277, 110 S.Ct. at 2851 (emphasis added). The Court went on, however, to make clear that "determining that a person has a liberty interest under the Due Process Clause does not end our inquiry; 'whether respondent's constitutional rights have been violated must be determined by balancing [her] liberty interests against the relevant state interests.'" *Id.* at 279, 110 S.Ct. at 2851–52 (citation omitted).

Although the *Cruzan* Court stopped short of defining a clearly cognizable liberty interest, it *assumed* the existence of such a constitutional right to terminate unwanted life-

---

**10.** The Court notes, however, that *Rooker–Feldman* would apply to Jack Kevorkian since he *was* a party in the state court actions and had a full and fair opportunity to litigate in the state court most of the constitutional claims raised in this action.

The Michigan Supreme Court determined the United States Constitution does not prohibit states from imposing criminal penalties for assisting someone in committing suicide and that assisted suicide is a common law crime in Michigan which may be prosecuted under the common-law savings statute, M.C.L. § 750.505. *People v. Kevorkian, supra*, 527 N.W.2d 714. The Court unequivocally held that

"the Due Process Clause of the federal constitution does not encompass a fundamental right to commit suicide, with or without assistance, regardless of whether the would-be assistant is a physician."

527 N.W.2d at 732.

The court further rejected Kevorkian's equal protection argument, i.e., that terminally ill individuals who want help in ending their lives are denied a right enjoyed by terminally ill persons who opt to forego or discontinue life-sustaining medical treatment. *Id.* at n. 57.

Further, with respect to the "common law savings statute", M.C.L. § 750.505, under which assisted suicide may be criminally prosecuted, the Michigan Supreme Court determined that under its reinterpretation of the common law regarding assisted suicide, there is no federal or state constitutional violation of the prohibition against *ex post facto* laws. *Id.* at 739.

Thus, *Rooker–Feldman* would bar Kevorkian from proceeding in this court with his due process, equal protection and *ex post facto* claims.

sustaining medical treatment in order to reach the specific issue presented in the case, i.e., whether Missouri's requirement that evidence of a mentally incompetent patient's wishes as to the withdrawal of life-sustaining medical treatment, expressed while the patient was competent, be established by "clear and convincing evidence" comports with the United States Constitution:

> Although we think the logic of [the right to refuse medical treatment] cases discussed above would embrace such a liberty interest, the dramatic consequences involved in refusal of such treatment would inform the inquiry as to whether the deprivation of that interest is constitutionally permissible. But for purposes of this case, *we assume* that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition.

*Id.* at 279, 110 S.Ct. at 2852.[11]

Further, as indicated above, the *Cruzan* court emphasized that if such a liberty interest existed, it would have to be balanced against relevant state interests such as the preservation of life.[12]

As Defendant Thompson points out, recognition of rights that are not readily identifiable in the text of the Constitution depends on whether they are "implicit in the concept of ordered liberty" so that "neither liberty nor justice would exist if they were sacrificed." *Palko v. Connecticut,* 302 U.S. 319, 325–26, 58 S.Ct. 149, 151–53, 82 L.Ed. 288 (1937); *Snyder v. Massachusetts,* 291 U.S. 97, 105, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934). Such rights must be "deeply rooted in the Nation's history and traditions." *Moore v. City of East Cleveland,* 431 U.S. 494, 503, 97 S.Ct. 1932, 1938, 52 L.Ed.2d 531 (1977).

This Court finds that a right to suicide or assisted suicide is not "deeply rooted in the Nation's history and traditions." Our analysis begins with the historical and legal status of suicide itself. Suicide has traditionally been a criminal offense. 2 LaFave & Scott, *Substantive Criminal Law,* § 7.8, pp. 246–251. Indeed, suicide was a crime at English common law, punishable by forfeiture of lands and chattels. *People v. Kevorkian, supra,* 527 N.W.2d at 731 note 49. English attitudes toward suicide, including its criminality, carried over to America. Thomas J. Marzen, *Suicide: A Constitutional Right,* 24

---

**11.** The facts of *Cruzan* are set forth at 497 U.S. at 265–69, 110 S.Ct. at 2845–46. They are summarized as follows.

Nancy Cruzan was rendered incompetent as a result of severe injuries sustained in an automobile accident. After it had become apparent that Nancy had virtually no chance of regaining her mental faculties, her parents asked hospital employees to terminate life supporting nutrition and hydration procedures, which all parties agreed would terminate her life. The employees refused to honor the parents' request without court approval. The parents then sought and received authorization from the state trial court for termination of life support. The state court found that a person in Nancy's condition had a fundamental right under the State and Federal Constitutions to refuse or direct the withdrawal of life support. The trial court also found that thoughts Nancy had expressed to her former roommate regarding not wanting to prolong her life if she were seriously ill or injured unless she could live at least half way normally suggested that she would not want to continue with her nutrition and hydration.

The Missouri Supreme Court reversed. It found no State or Federal Constitutional right that would support the right of a person to refuse medical treatment in every circumstance, and

further found that the Missouri Living Will statute, Mo.Rev.Stat. § 459.010 *et seq.* embodied a state policy strongly favoring the preservation of life. Because of this strong life-protecting policy, the Missouri Court concluded that "no person can assume [the choice to terminate life-sustaining medical treatment] for an incompetent in the absence of clear and convincing, inherently reliable evidence...." 497 U.S. at 269, 110 S.Ct. at 2846. The court found that in Nancy Cruzan's case, the statements she made to her roommate were unreliable for the purpose of determining her intent. Therefore, it found insufficient clear and convincing reliable evidence to support Cruzan's parents' authority to order termination of life support on her behalf.

**12.** Other relevant state interests were delineated by the Ninth Circuit in *Compassion in Dying v. State of Washington, supra.* According to the Ninth Circuit, in addition to the state's general interest in preserving life, these interests include the interest in preventing suicide; the interest in avoiding the involvement of third parties and in precluding the use of arbitrary, unfair, or undue influence; the interest in protecting family members and loved ones; and the interest in protecting the integrity of the medical profession. 79 F.3d at 816–17.

Duq.L.Rev. 1, 64–65, *citing* A. Scott, *Criminal Law in Colonial Virginia* at 198–199 & n. 16 (1930). It remained a crime on the books in the majority of states through most of the nineteenth century. Marzen, *supra*, at 85.

With respect to "assisted suicide", as the Michigan Supreme Court pointed out, at the time the Fourteenth Amendment was ratified, at least 21 of the 37 then existing states proscribed assisted suicide either by statute or as a common law offense. *Id.*, 527 N.W.2d at 731. Presently, 32 jurisdictions have statutes that criminalize assisted suicide. *Id.*, 527 N.W.2d at 731, n. 51. The Model Penal Code also provides penalties for assisted suicide. *Model Penal Code*, §§ 210.5 and 3.07(5).[13]

As the foregoing discussion makes clear, it cannot be said that assisted suicide is "deeply rooted in the nation's history and traditions." It was this analysis that persuaded the Michigan Supreme Court to reject this same argument. In *People v. Kevorkian*, the court reviewed the history of suicide in England and in this country and concluded that such "a right is not expressly recognized anywhere in the United States Constitution or in the decisions of the United States Supreme Court, and cannot reasonably be inferred." 527 N.W.2d at 732. Based on this conclusion, the court held that the "Due Process Clause of the federal constitution does not encompass a fundamental right to commit suicide, with or without assistance, and regardless of whether the would-be assistant is a physician." *Id.* at 733.

The Second Circuit also declined to find a fundamental right to assisted suicide in *Quill v. Vacco*, *supra*.[14] In *Quill*, the plaintiffs sought a declaratory judgment declaring that the New York statute criminalizing assisted suicide was unconstitutional. The *Quill* court explained its rejection of the plaintiffs'

due process-fundamental right argument as follows:

[T]he Supreme Court has drawn a line, albeit a shaky one, on the expansion of fundamental rights that are without support in the text of the Constitution. In *Bowers [v. Hardwick*, 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986)], the Supreme Court framed the issue as "whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy and hence invalidates the laws of the many States that still make such conduct illegal and have done so for a very long time." 478 U.S. at 190, 106 S.Ct. at 2843. Holding that there was no fundamental right to engage in consensual sodomy, the Court noted that the statutes proscribing such conduct had "ancient roots." *Id.* at 192, 106 S.Ct. at 2844–45. The Court noted that sodomy was a common law criminal offense, forbidden by the laws of the original 13 states when they ratified the Bill of Rights, and that 25 states and the District of Columbia still penalize sodomy performed in private by consenting adults. *Id.* at 192–93, 106 S.Ct. at 2844–46.

As in *Bowers*, the statute plaintiffs seek to declare unconstitutional here cannot be said to infringe upon any fundamental right or liberty. As in *Bowers*, the right contended for here cannot be considered so implicit in our understanding of ordered liberty that neither justice nor liberty would exist if it were sacrificed. Nor can it be said that the right to assisted suicide claimed by plaintiffs is deeply rooted in the nation's traditions and history. Indeed, the very opposite is true. The Common Law of England, as received by the American colonies prohibited suicide and attempted suicide. Although neither suicide nor attempted suicide is any longer a crime in the United States, 32 states, in-

13. Three additional states and the District of Columbia do not impose explicit criminal sanctions on assisted suicide, but nonetheless condemn assisted suicide in statutes allowing the withdrawal of medical treatment. *See Compassion in Dying v. State of Washington*, *supra*, 79 F.3d at 847 n. 11 (Beezer, J. dissenting). An additional four states, including Michigan, impose criminal penalties under case law. *Id.*, 79 F.3d at 847 n. 12.

14. As discussed *infra*, the *Quill* court, did, however, find that a New York statute criminalizing assisted suicide violated the Equal Protection Clause.

cluding New York, continue to make assisted suicide an offense. Clearly no "right" to assisted suicide ever has been recognized in any state in the United States.

In rejecting the due process-fundamental rights argument of the plaintiffs, we are mindful of the admonition of the Supreme court:

> Nor are we inclined to take a more expansive view of our authority to discover new fundamental rights imbedded in the Due Process Clause. The Court is most vulnerable and comes nearest to illegitimacy when it deals with judge-made constitutional law having little or no cognizable roots in the language or design of the Constitution.

*Bowers,* 478 U.S. at 194, 106 S.Ct. at 2846. The right to assisted suicide finds no cognizable basis in the Constitution's language or design, even in the very limited cases of those competent people who, in the final stages of terminal illness seek the right to hasten death. We therefore decline the plaintiffs' invitation to identify a new fundamental right, in the absence of a clear

direction from the Court whose precedents we are bound to follow. The limited room for expansion of substantive due process rights and the reasons therefor have been clearly stated: "As a general matter, the Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this unchartered area are scarce and open-ended."

80 F.3d at 724–35 (some citations omitted).

The Court is mindful that in its *en banc* opinion in *Compassion in Dying, supra,* 79 F.3d 790, the Ninth Circuit determined that the Constitution does encompass a due process liberty interest in controlling the time and manner of one's death.[15] However, the Court believes that the majority's reasoning in that case is seriously flawed. Like Plaintiffs here, the *Compassion in Dying* majority relied almost exclusively on *Planned Parenthood v. Casey, supra,* and *Cruzan, supra,* and whole-heartedly rejected an historical analysis, even though it conceded that the three-judge panel's historical analysis was "indisputably correct".[16] The Ninth Circuit agreed with the district court's finding of a

---

**15.** *Compassion in Dying* involved a declaratory judgment action brought in the United States District Court for the Western District of Washington by three terminally ill individuals, four doctors and "Compassion in Dying", a nonprofit organization whose avowed purpose is to assist competent terminally ill persons to hasten their death by providing them with information and counseling. The plaintiffs sought a declaration that a Washington statute which criminalized assisting in a suicide, R.C.W. 9A.36.060, was unconstitutional.

The district court agreed with the plaintiffs and declared that the statute was unconstitutional, finding that the statute "places an undue burden on the exercise of a protected Fourteenth Amendment liberty interest by terminally ill, mentally competent adults" and "violates the right to equal protection under the Fourteenth Amendment by prohibiting physician-assisted suicide while permitting the refusal or withdrawal of life support systems for terminally ill individuals". *Compassion in Dying v. State of Washington,* 850 F.Supp. 1454, 1467 (W.D.Wash.1994).

The State of Washington appealed, and the original three-judge appellate panel reversed the district court's decision *in toto. Compassion in Dying v. State of Washington,* 49 F.3d 586 (9th Cir.1995).

On rehearing *en banc,* the Court of Appeals vacated the original three-judge panel's decision

and held that "a liberty interest exists in the choice of how and when one dies, and that the provision of the Washington statute banning assisted suicide as applied to competent, terminally ill adults who wish to hasten their deaths by obtaining medication prescribed by their doctors, violates the Due Process Clause." 79 F.3d at 838. (Because it found a due process violation, the *en banc* panel declared it unnecessary to review the equal protection decision. "One constitutional violation is enough to support the judgment that we reach here." *Id.*) .

**16.** The original three-judge panel in *Compassion in Dying,* like the Second Circuit in *Quill v. Vacco,* found that

> the decision of the district court lacks foundation in recent precedent. It also lacks foundation in the traditions of our nation. [Citations omitted.] In the two hundred and five years of our existence no constitutional right to aid in killing oneself has ever been asserted and upheld by a court of final jurisdiction. Unless the federal judiciary is to be a floating constitutional convention, a federal court should not invent a constitutional right unknown to the past and antithetical to the defense of human life that has been a chief responsibility of our constitutional government.
> *Id.* at 591.

cognizable constitutional interest and its finding of the Court's reasoning in *Casey* to be "highly instructive" and "almost prescriptive" for determining what liberty interest may inhere in a terminally ill person's choice to commit suicide. 79 F.3d at 813.

This Court believes that the original panel in *Compassion in Dying* correctly saw the flaw in the application of *Casey,* an abortion case:

> The language taken from *Casey,* on which the district court pitched its principal argument, should not be removed from the context in which it was uttered. Any reader of judicial opinions knows they often attempt a generality of expression and a sententiousness of phrase that extend far beyond the problem addressed.... To take three sentences out of an opinion over thirty pages in length dealing with the highly charged subject of abortion and to find these sentences "almost prescriptive" in ruling on a statute proscribing the promotion of suicide is to make an enormous leap, to do violence to the context and to ignore the differences between the regulation of reproduction and the prevention of the promotion of killing a patient at his or her request.

> ... The decision to choose death, according to the district court's use of *Casey*'s terms, involves "personal dignity and autonomy" and "the right to define one's own concept of existence, of meaning, of the universe and of the mystery of human life." The district court attempted to tie these concepts to the decision of a person terminally ill. But there is no way of doing so....

*Id.* at 591. Thus, the three-judge panel found the district court's decision to be

> [u]nsupported by the gloss on "liberty" written by *Casey,* a gloss on a gloss, inasmuch as *Casey* developed an interpretation of "liberty" first elaborated in *Eisenstadt v. Baird,* [405 U.S. 438, 453, 92 S.Ct. 1029, 1038, 31 L.Ed.2d 349 (1972) ] and implicitly controverted by *Cruzan....*

*Id.*

This Court agrees that attempting to equate abortion rights and their constitutional status with a right to have someone assist in a suicide confuses constitutional analysis with individual or moral notions of "human dignity". In the case of abortion rights, the Supreme Court balanced society's interest in protecting an inchoate life against the liberty interests of a woman to determine how she will live her life. Whether the Supreme Court has appropriately struck this delicate balance is not for this Court to say. But, the distinction between this fulcrum of constitutional analysis seems clearly different and separate from that presented in cases such as this in which there is claimed a constitutional right to have assistance in killing oneself.

The fallacy of equating abortion rights with assisted suicide rights in a constitutional due process context becomes starkly evident by virtue of the fact that the abortion decisions themselves uniformly recognize that at the point the fetus attains viability, the state's interest in protecting that life predominates over the mother's liberty interest to choose to end that life. *See, Roe v. Wade,* 410 U.S. 113, 159–164, 93 S.Ct. 705, 730–732, 35 L.Ed.2d 147 (1973). Indeed, *Roe* strictly forbids the abortion of a viable fetus except when absolutely necessary to save the life of the mother. *Id.,* at 163–65, 93 S.Ct. at 732. Clearly, the fulcrum point that the Court has formed in identifying the end point of the woman's liberty interest and the beginning of the state's interest is at the point of the fetus' ability to achieve and sustain life on its own.

Thus, this Court believes that rather than supporting a liberty interest in assisted suicide for those who are able to sustain life without life-support systems, the abortion decisions—by affirming the states' paramount interest in protecting viable life—actually supports the view that the state has a strong interest in protecting vulnerable, but viable, life.

In reaching its determination that no constitutionally-protected liberty interest is implicated by the prohibition of assisted suicide, the Court is sensitive to the separation of powers and federalism issues inherent in Plaintiffs' request to declare a constitutional right to assisted suicide. First, it seems to

the Court that this very difficult question is fundamentally and quintessentially a policy question which should be decided by the policy branches of government, not the courts. The issue of assisted suicide presents profound questions of medicine and medical ethics, theology and sociology, and numerous other far-reaching public policy issues. These are precisely the kinds of issues in which public input is vital, and courts are simply not equipped to conduct the type of comprehensive, broad-based hearings at which witnesses and experts on all sides of the question would testify about the broader policy ramifications of creating and regulating a right to assisted suicide. It is the Legislative and Executive branches which, in our system, are uniquely well-equipped to pursue these issues. Courts have before them only the legal arguments of lawyers and, while questions of law are certainly part of the equation, the core issues presented are fundamentally grounded in questions of policy and how we view ourselves as a society. In a democracy, these questions are best answered by those who must answer to the people for their policy product, not by those who have no accountability to the people.

We must be very clear here about what is really being asked of courts when they are requested to strike down laws prohibiting assisted suicide. What is being requested is that judges declare unconstitutional a law which prohibits assistance in taking a viable, self-sustaining life. This strikes the Court as not merely asking courts to venture into uncharted legal waters, but also uncharted moral and ethical waters.

Viewed in this context, it seems particularly critical for the policy branches of government to establish such a right, if one is to be established. Given the historical treatment of suicide and assisted suicide, the Court is loathe to find or create new constitutional rights where none existed before. As this Court has observed in the past, the Constitution is not a Rorschach test in which judges are free to find whatever shapes of morality and "human dignity" we wish. In a democracy, judges are not free to simply look at the Constitution and declare new rights to correct every perceived wrong, for if the Constitution comes to mean everything to everybody—a veritable grabbag of rights—it will mean nothing when we really need it to protect those fundamental rights which are clearly delineated, because its legitimacy and grandeur will have been drained from it.[17]

Nor does this Court accept Plaintiffs' argument that because the policy branches of government have not acted, the courts must. First, the fact that the policy branches of government have not acted to create a new right of assisted suicide is an indication that perhaps our society is not yet prepared to declare such a right. It is also of some import that the advocates of this right have been unsuccessful in placing this issue before the people through the ballot initiative process. This absence of a public mandate for action should make courts even more reticent to declare new rights in this area.

Finally, important principles of comity and Federalism are implicated here and must inform the Court's decision. Plaintiffs have asked this federal Court to strike down a law adopted by the State of Michigan, through its Supreme Court, in an area which has traditionally been left to the states—the regulation of medical and ethical conduct and the definition of crimes involving the taking of life. The regulation of this area goes to the heart of a state's traditional responsibility to define crimes and make determinations governing general health and welfare issues. Before federal courts invade and preempt this province of the states, it must be shown that there is an overriding federal constitutional interest which dictates such extraordi-

---

17. The Court does not mean to trivialize the issue presented here, because it is a vitally important one to our society and it presents serious legal and constitutional questions. However, the Court cannot help but observe that we live in an age of instant gratification—people want things when they want them and how they want them. Those who are unable to achieve the result the wish from the policy branches of government (or through the referendum process) immediately come to the courts for relief; and, all too often, courts are seduced by the siren call to "do justice." Indeed, it sometimes seems that the Judiciary is in danger of becoming the "fast-food" institution of government. (If we are not careful, the sign "Welcome to McJustice" may replace "Equal Justice Under Law" above courthouse doors.)

nary action. Here, there has been no showing made of an overriding federal interest which would require displacement of state law.

For all of these reasons, the Court must decline Plaintiffs' invitation to find a due process liberty interest right in the Constitution which confers constitutionally protected status upon assisted suicide.

## PLAINTIFFS' EQUAL PROTECTION CLAIM ALSO IS WITHOUT MERIT

█ In Count III, Plaintiffs contend that persons seeking physician assistance with suicide are denied equal protection under the laws when the law protects the right to reject medical treatment for those on life support, but those not on life support are denied assistance with suicide. Plaintiffs' argument is based on the notion that a withdrawal of life supporting nutrition and hydration is indistinguishable from assisted suicide. They contend that the withdrawal of food, water and respiration are "overt" acts, not "omissive" conduct. They argue that because these acts are overt, there is no rational distinction between them and acts to hasten death by means of assisted suicide.

The Michigan Supreme Court rejected this same argument in *People v. Kevorkian, supra:*

> Indeed, the notion that there is a difference between action and inaction is not unfamiliar to the law. For example, the distinction between "misfeasance" and "nonfeasance" (the distinction between active misconduct and passive inaction) is deeply rooted in the law of negligence. The reason for the distinction is said to lie in the fact that a defendant creates a new risk of harm by misfeasance, but merely fails to benefit another by nonfeasance. As Dean Prosser explains, the duty to do no wrong is a legal duty, while the duty to protect against wrong, is for the most part, a moral obligation.

527 N.W.2d at 728.

Plaintiffs rely on Justice Scalia's concurrence in *Cruzan* for the proposition that there is no meaningful difference between

the withdrawal of life support and an overt act to terminate life. But the *Cruzan* majority rejected Justice Scalia's position. Furthermore, Justice Scalia's discussion does not support an equal protection challenge in these circumstances. Justice Scalia stated that the legislative line-drawing should not be between action and inaction. In his view, the line should be drawn between "those forms of inaction that consist of abstaining from 'ordinary' care and those that consist of abstaining from 'excessive' or 'heroic' measures." *Cruzan*, 497 U.S. at 296, 110 S.Ct. at 2861. This reasoning actually supports the notion that the distinction between the withdrawal of artificial life support provided to a comatose, vegetative-state individual, such as Nancy Cruzan, may be permissible while affirmative steps to hasten the death of a medically alert, competent, albeit suffering, adult may not. Thus, even under Justice Scalia's view, Plaintiffs' equal protection claim fails.

Furthermore, although the *Cruzan* court recognized a common law and a constitutional right to reject medical treatment, the court emphasized that no general right to suicide exists:

> We do not think a State is required to remain neutral in the face of an informed and voluntary decision by a physically able adult to starve to death.

497 U.S. at 280, 110 S.Ct. at 2852.

There is a rational basis for distinguishing withdrawal of life support from assisting at a suicide. As the Michigan Supreme Court explained:

> [W]hereas suicide involves an affirmative act to end a life, the refusal or cessation of life-sustaining medical treatment simply permits life to run its course, unencumbered by contrived intervention. Put another way, suicide frustrates the natural course by introducing an outside agent to accelerate death, whereas the refusal or withdrawal of life-sustaining medical treatment allows nature to proceed, i.e., death occurs because of the underlying condition.

527 N.W.2d at 728.

This distinction is also recognized in the *Guidelines for State Court Decision Making*

*in Life–Sustaining Medical Treatment* (1992):

> There are significant moral and legal distinctions between letting die (including the use of medications to relieve suffering during the dying process) and killing (assisted suicide/euthanasia). In letting die, the cause is seen as the underlying disease process or trauma. In assisted suicide/euthanasia, the cause of death is seen as the inherently lethal action itself.

*Id.* at 143–45.

The equal protection clause of the Fourteenth Amendment requires only that states treat in a similar manner all individuals who are similarly situated. Rotunda & Nowak, *Treatise on Constitutional Law, supra*, § 18.2. As the Supreme Court has explained, "so, too, the Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). As the *Plyler* court declared, the initial discretion to determine what is "different" and what is "the same" resides with the States, and the States "must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill." *Id.*

 Since, as discussed above, no "fundamental right" is involved, in the area of social welfare, all that is needed to pass equal protection muster in the area of social welfare is that the classification at issue bear some fair relationship to a legitimate public purpose. *Quill v. Vacco, supra*, 80 F.3d at 726–27. The Second Circuit in *Quill* found no legitimate state interest furthered by the New York statutes prohibiting assisted suicide and, therefore, determined that, in view of the statutory and common law schemes allowing "suicide" through the withdrawal of life-sustaining treatment, the assisted suicide statutes violated the equal protection clause. This Court disagrees with the *Quill* court's conclusion.

The *Quill* court looked to the "state interests" identified by the three-judge panel in *Compassion in Dying*. The panel there found that the Washington statute prohibiting assisted suicide furthered the following state interests: the interest in denying to physicians "the role of killers of their patients"; the interest in not subjecting the elderly or infirm to psychological pressure to consent to death; the interest of preventing the exploitation of the poor and minorities; the interest in protecting handicapped persons against societal indifference; the interest in preventing the sort of abuse that has occurred in the Netherlands. 49 F.3d at 592–93. The *Quill* court determined that none of these interests were furthered by the statutes prohibiting assisted suicide in light of New York law allowing withdrawal of life support.[18]

This Court disagrees with the conclusion that *none* of these interests is furthered, and

---

**18.** According to the *Quill* court:

> Physicians do not fulfill the role of "killer" by prescribing drugs to hasten death any more than they do by disconnecting life-support systems. Likewise, "psychological pressure" can be applied just as much upon the elderly and infirm to consent to withdrawal of life-sustaining equipment as to take drugs to hasten death. There is no clear indication that there has been any problem in regard to the former, and there should be none as to the latter. In any event the state of New York may establish rules and procedures to assure that all choices are free of such pressures. With respect to protection of minorities, the poor and the non-mentally handicapped, it suffices to say that these classes of persons are entitled to treatment equal to that afforded to all those who now may hasten death by means of life-support

> withdrawal. In point of fact, these persons themselves are entitled to hasten death by requesting such withdrawal and should be free to do so by requesting appropriate medication to terminate life during the final stages of terminal illness.

> As to the interest in avoiding abuse similar to that occurring in the Netherlands, it seems clear that some physicians there practice nonvoluntary euthanasia although it is not legal to do so. The plaintiffs here do not argue for euthanasia at all but for assisted suicide for terminally-ill, mentally competent patients, who would self-administer the lethal drugs. It is difficult to see how the relief plaintiffs seek would lead to the abuses found in the Netherlands.

80 F.3d at 730.

contrary to the *Quill* court's conclusion, the Court particularly believes that the first noted interest—the interest in denying to physicians "the role of killers of their patients"—*is* furthered. The *Quill* court obviously found this interest not to be furthered because it, like Plaintiffs here, rely on Justice Scalia's passing discussion in *Cruzan* disagreeing with drawing a line between action and inaction. Like the Michigan Supreme Court, this Court finds that distinction is worthy of recognition, and recognizing that distinction, the Court finds that the *Quill* court's conclusion that "[p]hysicians do not fulfill the role of 'killer' by prescribing drugs to hasten death any more than they do by disconnecting life-support systems", 80 F.3d at 730, is wrong.

The Court is also impressed with the strength of the state's interest in regulating the circumstances under which a life may be ended. This is perhaps the strongest interest a state has, and it is precisely the interest the Supreme Court recognized in *Cruzan* when it found that Missouri could lawfully regulate the circumstances surrounding the withdrawal of life support. *See Cruzan, supra,* 497 U.S. at 279–84, 110 S.Ct. at 2852–54. Here, the Michigan law clearly furthers that interest and a state's traditional authority to define crimes and issues of public welfare. Too, the Michigan law against assisted suicide furthers the state's legitimate interest in protecting vulnerable, but viable, people from the self-interested importuning of third parties. All of these valid state interests are furthered by the Michigan law.

*PLAINTIFFS' CLAIMS OF VAGUENESS, OVERBREADTH AND EX POST FACTO VIOLATION*

 In Count I, Plaintiffs allege that both the common law regarding assisted suicide as "created" by the Michigan Supreme Court in 1994, and M.C.L. § 750.505 (the common law savings statute) are unconstitutionally vague, overbroad, and violative of the prohibition against *ex post facto* laws.

With respect to vagueness and overbreadth and the common law savings statute, Plaintiffs argue that M.C.L. § 750.505 is "irreparably vague and overbroad" because it does not take into consideration the nature of the "common law" crime which the statute makes a felony. They contend that if left standing as a valid statute, M.C.L. § 750.505 "gives Michigan courts the unfettered power to imposed judicially created law at whim" because the statute does not define any crime, yet imposes a penalty of 5 years imprisonment. Plaintiffs have not, however, cited any authority holding that a savings statute, in Michigan or anywhere else, can be struck down on the basis of vagueness or overbreadth merely because the statute preserves earlier common law.

The common law savings statute at issue, M.C.L. § 750.505 provides as follows:

Any person who shall commit any indictable offense at the common law, for the punishment of which no provision is expressly made by any statute of this state, shall be guilty of a felony, punishable by imprisonment in the state prison not more than 5 years or by a fine of not more than $10,000, or both in the discretion of the court.

"State statutes, like federal ones, are entitled to a presumption of constitutionality." *Davies Warehouse Co. v. Bowles,* 321 U.S. 144, 153, 64 S.Ct. 474, 479, 88 L.Ed. 635 (1944); *Beech v. Melancon,* 465 F.2d 425, 426 (6th Cir.1972), *cert. denied,* 409 U.S. 1114, 93 S.Ct. 927, 34 L.Ed.2d 696 (1973).

The doctrine of unconstitutional vagueness [19] requires only that the legislature establish a general guideline to govern law enforcement. *Kolender v. Lawson,* 461 U.S. 352, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983). The doctrine imposes a "fair notice" requirement to prevent states from holding an individual criminally responsible for conduct which he could not reasonably understand to be proscribed. *Rose v. Locke,* 423 U.S. 48, 96 S.Ct. 243, 46 L.Ed.2d 185 (1975). Howev-

---

**19.** Vagueness and overbreadth are often spoken of together, as Plaintiffs do in this case. However, in non-first amendment areas, generally it is actually only the void-for-vagueness doctrine that applies. Rotunda & Nowak, *Treatise on Consti-*

*tutional Law, Substance and Procedure,* 2nd § 20.9. The arguments of Plaintiffs' counsel at the hearing held on this matter make clear that it is, indeed, a "void for vagueness" argument that Plaintiffs assert in this case.

er, it is not required that statutes specify in every detail the proscribed behavior, and courts have found it sufficient "fair notice" to survive a vagueness challenge for the statute to incorporate the common law definition of a crime.

For example, in *United States ex rel. Almeida v. Rundle*, 383 F.2d 421 (3rd Cir. 1967), the Third Circuit addressed a claim that Pennsylvania's first-degree murder statute was unconstitutionally vague because it did not define murder. The court acknowledged that Pennsylvania had no statutory definition of murder, at all. The definition of murder in Pennsylvania, as the *Almeida* court observed, was provided in the common law. The court found this sufficient to preclude the defendant's unconstitutional vagueness argument: "The absence of a definition of murder in the degree statute is not a defect at all. True, the common law may be imprecise, but that is not a determinative factor here. The common law of murder is well-enough defined...." *Id.* at 425.

Michigan courts have repeatedly upheld § 750.505 in cases raising the same void-for-vagueness challenges. *See People v. Pickett*, 339 Mich. 294, 63 N.W.2d 681 (1954); *People v. O'Neal*, 22 Mich.App. 432, 177 N.W.2d 636 (1970). In *Pickett* and *O'Neal*, the Michigan courts examined the common law regarding conspiracy and held that the defendants' argument regarding the vagueness of § 750.505 was without merit because criminal conspiracy was defined in the common law.

Michigan specifically recognizes all common law offenses except those expressly abrogated by Constitution or statute. *Bugbee v. Fowle*, 277 Mich. 485, 492, 269 N.W. 570, 572 (1936); *People v. Schmitt*, 275 Mich. 575, 267 N.W. 741 (1936) (the common law definition of crimes prevails unless it has been changed by a penal statute); *People v. McDonald*, 409 Mich. 110, 117, 293 N.W.2d 588, 590 (1980) (underlying the criminal statutory scheme of Michigan is the common law). This policy is further specifically embodied in the Michigan Constitution: "the common law and the statute laws now in force, not repugnant to this Constitution, shall remain in force until they expire by their own limitations, or are changed, amended or repealed."

Mich. Const.1963, art. 3, § 7. The " 'common law' is but the accumulated expressions of the various judicial tribunals in their efforts to ascertain what is right and just...." *Bugbee v. Fowle, supra*, 277 Mich. at 492, 269 N.W. 570.

Providing by statute penalties for crimes indictable at common law but not statutorily delineated is not a concept unique to Michigan; several states have such "common law savings statutes". *See People v. Causley*, 299 Mich. 340, 350–51, 300 N.W. 111 (1941) and citations therein. *See also, State v. Price*, 672 A.2d 893 (R.I.1996); *State v. Woodworth*, 234 N.W.2d 243 (N.D.1975). The purpose of such common law offense statutes is to assure that a person who has committed an offense at common law cannot evade prosecution and punishment merely because the offense has not been declared a crime in the statutes of the state. Wayne R. LaFave and Austin W. Scott, Jr., 1 *Substantive Criminal Law*, § 2.1(f) at 101. As the Michigan Supreme Court observed in *People v. Stevenson*, 416 Mich. 383, 391, 331 N.W.2d 143 (1982), "The suggestion that crimes can *only* be defined by statute is not well-taken, particularly in light of the fact that in Michigan, [even] murder is defined by the common law and not by statute."

Thus, to the extent that Plaintiffs challenge the common law savings statute as unconstitutionally vague merely because no crime is defined therein, the Court finds no merit in that argument.

■ However, at oral argument, it became clear that Plaintiffs' principal unconstitutional vagueness argument is aimed at the Michigan Supreme Court's December 1994 declaration of assisted suicide as a well-established common law crime in Michigan in *People v. Kevorkian, supra*, 527 N.W.2d 714. The Michigan Supreme Court noted in *Kevorkian* that aiding another person in committing suicide was recognized as an indictable crime under the common law since 1920 when the Michigan Supreme Court decided *People v. Roberts*, 211 Mich. 187, 178 N.W. 690 (1920).

In *Roberts*, the defendant was convicted of murder for helping his wife commit suicide.

The defendant's wife was bedridden and helpless with incurable multiple sclerosis. She had previously tried to commit suicide, but was unsuccessful. Therefore, she asked her husband to help her. At Mrs. Roberts' request, the defendant mixed deadly poison in a cup and placed it on a chair near her side. The defendant knew his wife wanted to die and she did, in fact, drink the poison and die.

On appeal to the Supreme Court, the defendant claimed that he committed no crime. He argued that since suicide was not a crime, aiding his wife in doing something that was not criminal could not be a crime, either. The Supreme Court held that Roberts' acts constituted murder by poison. In reaching that conclusion, the *Roberts* court examined the common law of murder and assisting in a suicide, at length:

In considering the status of one who advises or aids another to commit suicide, 37 Cyc. p. 521, has this to say:

"Where one person advises, aids, or abets another to commit suicide, and the other by reason thereof kills himself, and the adviser is present when he does so, he is guilty of murder as a principal, or in some jurisdictions of manslaughter; or if two persons mutually agree to kill themselves together, and the means employed to produce death take effect upon one only, the survivor is guilty of murder of the one who dies. But if the one who encourages another to commit suicide is not present when the act is done, he is an accessory before the act and at common law escapes punishment because his principal cannot be first tried and convicted. The abolition of the distinction between aiders and accessories in some jurisdictions, has, however, carried away this distinction, so that a person may now be convicted of murder for advising a suicide, whether absent or present at the time it is committed, provided the suicide is the result of his advise."

It is said in Tiffany on Criminal Law, p 979, that:

"He who kills another at his own desire or command is a murderer as much

as if he had done it of his own head; and the person killed is not a *felo de se.*"

To the same effect, 1 McLain's Criminal Law, 290; *State v. Ludwig,* 70 Mo. 412 [ (1979) ]; *Commonwealth v. Bowen,* 13 Mass. 356 [ (1816) ]; or *Commonwealth v. Mink,* 123 Mass. 422 [ (1877) ]; *Commonwealth v. Hicks,* 118 Ky. 637 (82 S.W. 265) [ (1904) ]; *Burnett v. People,* 204 Ill. 208 (68 N.E. 505, 66 L.R.A. 304) [ (1903) ]; *Blackburn v. State,* 23 Ohio St. 146 [ (1872) ].

In the last case cited the facts and questions raised bear a close analogy to the case we are considering. A like contention was made with reference to suicide, and in answering it the court said:

"It is said by counsel that suicide is no crime by the laws of Ohio, and that therefore there can be no accessories or principals in the second degree in suicide. This is true, but the real criminal act charged here is not suicide, but the administering of poison. And to this criminal act there may be accessories, and principals in the second degree. If I furnish poison to a guilty agent, an accomplice, to be administered by him, and he administers it accordingly, I am an accessory before the fact; and if I stand by and counsel or encourage him in the act of administering the poison to another, I am a principal in the second degree. But no question of this kind arises in the present case, either upon the indictment or in the evidence. There is no claim or pretense that there was any guilty third person participating in the transaction. The charge is that the prisoner, as principal in the first degree, is guilty of administering poison, and thereby causing death."

Whether the act of mixing the strychnine with wine and giving it to the deceased to drink was administering poison within the meaning of the statute, the opinion says:

"We think also that the court was right in instructing the jury, as in substance and effect it did, that it is immaterial whether the party taking the poison took it willingly, intending thereby

to commit suicide, or was overcome by force, or overreaching by fraud. True, the atrocity of the crime, in the moral sense, would be greatly diminished by the fact that suicide was intended; yet the law as we understand it, makes no discrimination on that account. The lives of all are equally under the protection of the law, and under that protection to their last moment. The lives of those to whom life has become a burden—of those who are hopelessly diseased or fatally wounded—nay, even the lives of criminals condemned to death, are under the protection of the law, equally as the lives of those who are in the full tide of life's enjoyment, and anxious to continue to live. If discriminations are to be made in such cases as to the amount of punishment due to offenders, they must be made by the exercise of executive clemency or legislative provision. Purposely and maliciously to kill a human being, by administering to him or her poison, is declared by the law to be murder, irrespective of the wishes or the condition of the party to whom the poison is administered, or the manner in which, or the means by which, it is administered. The fact that the guilty party intends also to take his own life, and the administration of the poison in pursuance of an agreement that both will commit suicide, does not, in a legal sense, vary the case. If the prisoner furnished the poison to the deceased for the purpose and with the intent that she should with it commit suicide, and she accordingly took and used it for that purpose; or if he did not furnish the poison, but was present at the taking thereof by the deceased, participating by persuasion, force, threats, or otherwise, in the taking thereof, or the introduction of it into her stomach or body; then in either of the cases supposed, he administered the poison to her within the meaning of the statute."

\* \* \* \* \* \*

We are of the opinion that when defendant [Roberts] mixed the paris green with water and placed it within reach of his wife to enable her to put an end to her suffering by putting an end to her life, he was guilty of murder by means of poison ... even though she requested him to do so. By this act he deliberately placed within her reach the means of taking her own life, which she could have obtained in no other way by reason of her helpless condition.

211 Mich. at 196–198, 178 N.W. 690.

In *People v. Kevorkian*, the Michigan court modified the *Roberts* ruling, but expressly declared that the criminality of assisting suicide was not abolished. The *Kevorkian* court explained:

In the years since 1920, when *Roberts* was decided, interpretation of causation in criminal cases has evolved in Michigan to require a closer nexus between an act and a death than was required in *Roberts*.... The United States Supreme Court has also addressed the importance of relating culpability to criminal liability....

[T]his court has modified the common law when it perceives a need to tailor culpability to fit the crime more precisely than is achieved through application of existing interpretations of the common law.... [W]e perceive such a need here. Accordingly, we would overrule *Roberts* to the extent that it can be read to support the view that the common-law definition of murder encompasses the act of intentionally providing the means by which a person commits suicide. Only where there is probable cause to believe that death was the direct and natural result of a defendant's act can the defendant be properly bound over on a charge of murder. *Where a defendant merely is involved in the events leading up to the death, such as providing the means, the proper charge is assisting in a suicide.*

527 N.W.2d at 738 (emphasis added).

Defendant Thompson argues that the definition of the crime of assisted suicide is ascertainable from a review of the common law and, therefore, Plaintiffs' argument that Michigan's common law savings statute is void for vagueness should be rejected.

The Court agrees with Defendant that on a "going forward" basis, i.e., after December

13, 1994, the date on which the Supreme Court decided *Kevorkian,* there is certainly no merit in an unconstitutional vagueness challenge with respect to Michigan common law, and since Plaintiff Good· was never charged nor implicated in any of Dr. Kevorkian's "assisted suicides" until June 1996, her void for vagueness challenge fails.

However, to the extent that Ms. Good's claim in this case is predicated on her belief that she may be prosecuted for assisting in Lois Hawes' September 26, 1992 suicide, it cannot be said that it would have been readily ascertainable from a review of the common law as it existed prior to that date that assisted suicide was a crime in Michigan.

Although it is true that the *Roberts* decision was on the books since 1920, in 1983, the Michigan Court of Appeals decided *People v. Campbell,* 124 Mich.App. 333, 335 N.W.2d 27 (1983), a case involving facts substantially similar to *Roberts.* In the Court's view, this decision seriously muddied the waters as to what type of conduct was prosecutable in the context of aiding one to kill himself.

In *Campbell,* the decedent, Kevin Basnaw, and the defendant, Steven Campbell, had been drinking quite heavily when, late in the evening, Basnaw began talking about committing suicide. Some time during the talk of suicide, Basnaw told Campbell that he did not have a gun. At first Campbell told Basnaw that he would not loan or sell him one of his guns, but he subsequently changed his mind, and told Basnaw that he would sell him a gun for whatever amount of money he had in his possession. At first Basnaw did not accept the offer, but Campbell persisted in alternately encouraging and ridiculing him.[20] Campbell and Basnaw then drove to Campbell's house to get the gun, leaving Basnaw's girlfriend behind. They returned to Basnaw's house with the weapon and five bullets 15 minutes later. Campbell left the gun and bullets with Basnaw, and then left with Basnaw's girlfriend. After they left, Basnaw wrote a suicide note and shot himself.

The prosecutor brought charges against Campbell relying on *Roberts,* contending that inciting to suicide, coupled with the overt act of providing Kevin Basnaw with the means to commit suicide, rendered Campbell criminally liable for open murder under Michigan common law. After his motion to dismiss was denied, Campbell appealed to the Michigan Court of Appeals. The Court of Appeals found the facts giving rise to the charges against Campbell to be indistinguishable from *Roberts.* More importantly to this analysis, however, the court went on to find in *Campbell* that *Roberts* was no longer good law:

> We now consider whether the *Roberts* case still represents the law of Michigan, and we find it does not. Recent cases of our Supreme Court cast doubt on the vitality of the 1920 *Roberts* decision.

335 N.W.2d at 29.

The *Campbell* court, thus, concluded, "While we find the conduct of the defendant morally reprehensible, we do not find it to be criminal under the present state of the law." *Id.* at 31.

Thus, this Court finds that, in light of the *Campbell* decision and the unsettled nature of the law following that decision, it cannot be said that in 1992, the common law would have provided Janet Good with "fair notice" that assisting in a suicide was a crime in Michigan. Indeed, the fact that the Michigan Supreme Court indicated in *Kevorkian* that the law in this area had "evolved" is an implicit recognition by that Court that the parameters of a crime involving assistance in a death were less than clearly defined.[21] It was not until the Michigan Legislature passed the now-expired assisted suicide statute in December 1992 that it can be said that a reasonable person could have reasonably understood that assisting in a suicide was a crime in Michigan.

Thus, to the extent that Defendant may intend to bring charges against Ms. Good under the Michigan Supreme Court's December 1994 interpretation of the common law in

---

**20.** It appears that about two weeks prior to the evening in question, Campbell caught Basnaw in · bed with his wife.

**21.** The Court notes that two members of the *Campbell* panel were members of the Michigan Supreme Court when *Kevorkian* was decided.

**1179**

*People v. Kevorkian* for assisting in any suicides prior to December 1992, such charges would not pass constitutional muster.

## CONCLUSION

For all of the reasons stated in this Amended Opinion and Order,

THE COURT HEREBY DECLARES AND ORDERS AS FOLLOWS:

IT IS HEREBY ORDERED that, for the reasons stated in this Amended Opinion and Order, Plaintiffs' request for injunctive relief is hereby DENIED.

IT IS HEREBY DECLARED that a mentally competent, terminally ill or intractably suffering adult does not have a liberty interest protected by the Fourteenth Amendment's Due Process Clause in assisted suicide.

IT IS FURTHER DECLARED that the Equal Protection Clause of the Fourteenth Amendment is not violated by denying a mentally competent, terminally ill or intractably suffering adult not on life support the right to assisted suicide.

IT IS FURTHER DECLARED that the Michigan law criminalizing assisting in a suicide as interpreted by the Michigan Supreme Court in *People v. Kevorkian*, 447 Mich. 436, 527 N.W.2d 714 (1994), and as applied to acts of assisted suicide prior to December 1992, is unconstitutionally vague, because the law as it existed from the date of the *Campbell* decision in 1983 until December 1992 would not have provided "fair notice" that assisting in a suicide was a crime in Michigan.